**Sharon Ann LAKE, Plaintiff,**

v.

**James A. BAKER, Secretary of the Treasury, Defendant.**

Civ. A. No. 85–2138.

United States District Court, District of Columbia.

March 16, 1987.

Christine L. Owens, Richard B. Sobol, Lynn Bernabei, Debra S. Katz, Washington, D.C., for plaintiff.

Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

### Introduction

This is a Title VII sex discrimination case. Ms. Lake seeks only damages from the date of her resignation from the National Office of the Criminal Investigation Division (CID) of the Internal Revenue Service on July 6, 1985. She claims that her resignation was in fact a constructive discharge caused by three specific instances of nonselection due to sex discrimination during 1984 and a pervasive atmosphere of intolerance for her gender. She seeks the compensation and retirement benefits she would otherwise have continued to receive as a GM–14 employee when she resigned. The Secretary disputes her specific discrimination and general sexual harassment claims, as well as the claim that she was constructively discharged.

This action was originally brought as a class action and plaintiff is one of the two named class representatives whose individual claims were set out in the Second Amended Complaint filed July 17, 1986. After the Court refused to certify high-level women employees of CID as a class, Ms. Lake's individual claims, which had been only partly processed administratively,[1] were heard by the Court in a bench trial following full discovery. A detailed record was developed over eleven trial days, at which thirty-five witnesses appeared and 113 exhibits were received. The issues

1. Ms. Lake never presented her present claims of constructive discharge administratively at any time.

have been fully briefed and detailed proposed findings of fact keyed to the record have been submitted.

Ms. Lake served two tours of duty with CID. Until her transfer to the National Office on her second tour, her work was of high quality and, as a consequence, she received rapid advancement and special recognition. She is a Certified Public Accountant and has special expertise in tax shelters. During her first tour, which lasted from 1972 to 1979, she served in the field, first for several months in the Los Angeles District Office as a GS–5 Special Agent and then in the Dallas District Office, where she received regular noncompetitive promotions. In March 1977, through competitive promotion she became a GS–13 Regional Analyst in the Southwest Regional Office which is also located at Dallas. She resigned on May 5, 1979, and took a job with a private law firm, doing work in the tax shelter area.

Ms. Lake re-entered CID on August 31, 1981 as a GS–12 Special Agent in its Oklahoma District Office and was promoted competitively in November 1981 to Group Manager, GM–13 and, again, in August 1982 noncompetitively to GM–14 Group Manager. A year later she agreed at the suggestion of top CID management officials to transfer to the National Office in Washington, D.C., to become Senior Coordinator for tax shelters. Subsequently she filled various other GM–14 positions at the National office over the following two years until she again resigned on July 6, 1985.

In presenting her case, Ms. Lake reviewed in minute detail[2] selected aspects of her experience during each tour, focusing on conversations and events involving different officials at different times in varying circumstances, all in an effort to demonstrate that sex bias was prevalent wherever she was assigned in CID and that for this reason she was rejected for positions she applied for and her desire to reach higher management levels was generally thwarted.

This running account, to some extent supplemented by documents, created a prima facie case viewing Ms. Lake's testimony most favorably to herself. She indicated a sexually discriminatory atmosphere, irregularities in the selection process apparently favoring males, and stated she was, in effect, forced to resign on both occasions because of sexual harassment. In the course of her testimony the accuracy of her Title VII representations was sharply questioned on cross-examination. When many witnesses were later called by the Secretary to testify and further documents were received, Ms. Lake's credibility was seriously disputed in practically every situation she had presented pertinent to her sex discrimination claims.

The Court has reviewed the conflicting versions of the facts with care. As the findings below indicate,[3] plaintiff failed to establish by a preponderance of the evidence her three specific claims of sex discrimination resulting in nonselection while at the National Office, and similarly totally failed to establish constructive discharge.

### Ms. Lake's First Tour of Duty

Although Ms. Lake's substantive claims center entirely on her second tour of duty and only for the period spent at the National Office, she was allowed to present proof of sexual harassment on her first tour as "background." This aspect concentrated on her experience with CID while she was in Dallas at the District Office and the Southwest Regional Office from 1972 until her resignation in 1979. The Court first examines these background experiences for whatever light they may later shed on her

---

**2.** Ms. Lake's testimony was very thorough. She became ill near the end of the Secretary's case and returned to Texas. Although the record was held open for a substantial period she was unable to return to testify on rebuttal due to her disturbed mental condition.

**3.** As previously indicated, the parties submitted detailed evidentiary proposed findings which have served as a useful guide to the record. Among other things each party, by underlining sections of the proposed findings of the other, has noted facts it does not dispute. The Court's findings are necessarily more conclusory. No significance attaches to the Court's failure to adopt a specific proposed finding of either party.

claims of discrimination during her tenure at the National Office in Washington, D.C. more than ten years later. They cannot by themselves, of course, provide a basis for awarding damages since the discrimination at that time was not the subject of an EEO complaint and time for suit has run.

Ms. Lake worked in the Dallas District office of CID for about five years. Glenn Shepard, Assistant Chief of the office, was her second-level supervisor from July 1973 to July 1974, when he was promoted to Chief and became her third-level supervisor. She was the only female agent in this small CID unit serving with several males. She entertained the agents occasionally at her home and travelled with them on work assignments to different locations within the jurisdiction of the office. Her work record was very good and she was considered an exceptionally valuable employee.

The preponderance of the evidence supports her claim that the atmosphere in the Dallas District Office at that time was gross, vulgar, sexually explicit and that it denigrated females. In the partitioned open-cubical office, male agents often engaged in provocative talk, told dirty jokes, and openly harassed and made sexual advances toward an attractive secretary. This condition did not affect her assignments or interfere with the fair appraisal of her work performance. It was at times very unpleasant for her and obviously inappropriate. There is no credible proof that Ms. Lake officially complained or vigorously objected while this was going on. Her occasional informal remonstrances were not taken seriously and were shrugged off without official action.

Mr. Shepard was an experienced CID agent and manager who, like some of the other agents, had served in various offices around the country before the advent of female agents in 1972.[4] He did not contribute directly to the unpleasant sexist atmosphere in the District Office by his own daily conduct but he knew the situation existed and did nothing positive to stop it.

He came to know Ms. Lake in the course of their working assignments which involved some travel together away from Dallas.

After a time Ms. Lake and Mr. Shepard found they enjoyed each other's social company after hours and, beginning in late fall 1973, they had a sexual affair of some duration. This situation became known to the staff and was a source of some pranks at a party. There is no proof or claim that Ms. Lake was forced into this relationship or that she incurred any advantage or disadvantage at work because of it. Mr. Shepard and Ms. Lake kept their relationship separate from their work and carried out their employment responsibilities in a normal manner.

As time went on Ms. Lake and Mr. Shepard saw each other socially less frequently, and while she was still employed Ms. Lake broke off the relationship, after resisting his persistent off-duty advances beginning in early 1974. During the period of Mr. Shepard's relations with Ms. Lake his first marriage was in difficulty. Ms. Lake had previously been divorced. The relationship was not Mr. Shepard's first office affair; later Mr. Shepard dated other women in CID and eventually remarried.

Shortly after becoming CID's Assistant Regional Commissioner for the Southwest Region in 1976, John Rankin, as part of his effort to install minority and women CID employees in management positions in the region, encouraged Ms. Lake to seek a position as GS–13 Regional Analyst in the Dallas Regional Office. She was highly qualified and was subsequently interviewed and selected. In March 1977, when she commenced this new position, Mr. Shepard had become Executive Assistant to the Regional Commissioner and he became her first-line supervisor.

Ms. Lake contends that Mr. Shepard raped her in her New Orleans hotel room in the spring or summer of 1978 while they were on a business trip. Mr. Shepard testified and flatly denied this charge. Ms. Lake never reported the alleged rape to

---

**4.** Prior to 1972 women were officially banned, by Executive Order, from service in these and other criminal investigative positions.

anyone in CID,[5] nor did she tell her close female friend to whom she confided other aspects of her relationship with Mr. Shepard. The Court accepts Mr. Shepard's detailed version of their relationship as the most credible.

In March 1979 Ms. Lake applied for several GM–14 Senior Regional Analyst positions which had become vacant in the Southwest Regional Office but was not selected. She submitted a letter of resignation on April 16, 1979, effective May 5, 1979. Ms. Lake testified she resigned because she was unwilling to tolerate the sexist atmosphere she had encountered any longer, and felt because she failed to gain a prompt promotion despite her outstanding ability and hard work her career path was blocked. She had been advised from the outset that one advanced slowly to higher management and only after "paying one's dues." But even at this early stage of her career she could not accept the obvious fact that advancement to higher management positions in CID was highly competitive and required extensive and varied experience.

When she resigned Ms. Lake initially gave no reasons for her action. Because her work had been of high quality and her ability was appreciated, key supervisors— particularly Walter Coppinger, the Regional Commissioner, and Mr. Rankin—attempted to dissuade her and sought to determine why she was leaving for private employment. At this point she submitted a ten-page memorandum entitled "Clarification of Resignation" which she discussed with Mr. Rankin. This memorandum reviewed in great detail her work experience both with CID and in other prior jobs she had held with private industry and with other government agencies. It revealed she had fought to get ahead, sometimes against heavy odds, and portrayed this experience as evidence of having paid her dues because she had come through many difficult circumstances. She said she had shifted jobs more than once because she refused sexual advances from male superi-

ors. She suggested that because of her age, then in the mid–30's, if she could not move up promptly into higher management such jobs would never be open to her. Not having been promoted she felt she was indeed a "token broad," as some male employees had indicated. She did not detail the atmosphere of the Dallas Office, of which she now complains, nor did she mention the alleged rape.

Mr. Rankin reviewed the memorandum with her in detail. As his contemporaneous notes reveal she told him, as to her reasons for leaving, that she felt she should have been promoted as best qualified, that she wanted to try out being a tax manager in industry, that she had medical problems associated with "nerves," and that she did not like some new federal statutes affecting merit pay which had an impact on managers. Mr. Rankin told her he would not tolerate anyone using the term "token broad" and that she should feel free to file an EEO complaint. He attempted to dissuade her. She stuck by her decision to leave, and did not file a complaint.

The Court finds Ms. Lake did not resign because of the sexual harassment that existed in the office, although she undoubtedly disliked the office atmosphere which she somewhat now exaggerates. Ms. Lake's testimony was unreliable in several respects. She misrepresented her relationship with Mr. Shepard and sought to imply that she was in some way being forced to put up with the sexist atmosphere of the office and Mr. Shepard's advances as part of "paying her dues." In fact she resigned to use her skills in the private sector, anticipating more rapid advancement, and hoped to be better able to deal with her medical problems.

There is no proof indicating that the harassing conditions in the Dallas District Office persisted into the relevant period of this case or that these conditions were then or at any later time typical in any way of

---

**5.** The rape charge was immediately investigated by CID when it surfaced for the first time during discovery in this case. Ms. Lake refused to cooperate with any investigation pending the outcome of this trial.

sexual attitudes in other District or Regional offices.

### Ms. Lake's Second Tour of Duty

Ms. Lake's substantive sex discrimination claims all relate to her experience in the National Office during her second tour of duty.

Ms. Lake started her second tour at the Oklahoma City District Office in August 1981 as a GS–12 Special Agent. She was competitively promoted to GM–13 Group Manager in November 1981 and in August 1982 promoted to GM–14 Group Manager. She concentrated on tax shelters and re-ceived a rare and highly prized "Distinguished Performance" rating. She stayed in the Oklahoma City Office until laterally transferred, with her consent, to serve as the Senior Coordinator for tax shelters at the National Office in Washington, D.C. with the rank of Senior Analyst, GM–14, a mid-level management grade.

Between 1982 and 1985, while Ms. Lake was at the National Office, the relevant lines of supervisory authority which affected her career are sketched below, to indicate the responsibilities of key officals with whom she came into contact:

DEPARTMENT OF THE TREASURY

COMMISSIONER OF INTERNAL REVENUE

ASSOCIATE COMMISSIONER (Operations)

ASSISTANT COMMISSIONER (Criminal Investigation)
—Richard Wassenaar, Ass't Commissioner
—John Rankin, Deputy Ass't Commissioner

| Office of Investigations | | Office of Planning & Development |
|---|---|---|
| —Brian T. Wellesley 2nd-line supervisor to Ann Lake | | —Charles Gibb 2nd-line supervisor to Ann Lake |
| —Stephen Hironaka 1st-line supervisor to Ann Lake | | —Peter Lalic 1st-line supervisor to Ann Lake |
| Ann Lake, Senior Coordinator, Tax Shelters | AND | George Scott, Jr. Analyst, Tax Shelters |

The National Office is basically a policy office. CID's operations are decentralized. Numerous separate District Offices scattered nationwide report to one of seven Regional Offices each overseeing a defined geographic area. The Regional Offices coordinate the District Offices and the agents and analysts under their charge.

The first level for entering a management role is GM–13/14 either as Group Manager in a District Office or Analyst in a Regional Office. The following chart shows the relative managerial ranks in the District and Regional Offices:

Management-Level Positions

| Regional Office | Level | District Office |
|---|---|---|
| Asst. Reg. Comm'r (ARC) | Top | Division Chief |
| Exec. Ass't ARC | Top | Asst. Division Chief |
| Sen. Reg. Analyst GM–14 | Mid | Branch Chief |
| Management and Evaluation Analyst GM–14 | Mid | Staff Asst. Div. Chief GM–14 |

| Regional Office | Level | District Office |
|---|---|---|
| Gen. Enforcement Program Analyst GM-14 | Mid | |
| Spec. Enforcement Program Analyst GM-14 | Mid | |
| Regional Analyst GM-13 | Entry | Group Manager GM-13/14 Staff Asst. Div. Chief GM-14 |

CID employees generally rise to high responsibility as managers only after successful experience in the field, gradually moving up through the ranks in stages, often serving in several District or Regional offices. In this progression, some experience in the National Office can be useful, but permanent assignment there, except at the very highest levels, has usually been considered undesirable by many employees climbing the management career ladder. Many agents and analysts in the field have had little interest in the National Office, considering it bureaucratic and less exciting because it has been more policy than operationally oriented.

Competition for advancement to management responsibility throughout CID is very keen. Usually vacancies are posted when they occur and those found best qualified are interviewed by a panel that includes one or more individuals who will be the selectee's immediate supervisor. Selection is made on the basis of career personnel data and an interview. The nature of CID work requires employees to move around and one or more panel members often have personally observed some of a particular applicant's on-the-job performance.

Many male witnesses who appeared had, like Ms. Lake, been interviewed but also like Ms. Lake, in spite of the highest qualifications, more than once had not been selected on the road upward. Indeed, significant advancement usually seems to have often occurred only after several rejections. The advent of women agents heightened the competition, but the movement up the management career ladder has remained slow as selections have continued to be made on the basis of minor differences against a traditionally exacting standard.

Quite obviously the reaction of a panel at an interview is crucial and the decisions of selecting panels are necessarily somewhat subjective. The views of an applicant's previous supervisors as expressed in ratings of managerial potential count heavily and are made known to the panel in the personnel package that is forwarded for each applicant. These materials concentrate on relevant qualities.

Conscious of this process, ambitious CID employees who seek management advancement request temporary, "acting" assignment into higher duties for a brief time to get experience and show their worth. These acting assignments are desirable. There is no systematic program for making these privileges available. They are parceled out as a possibility, usually unexpectedly develop, and often depend on availability of a particular person at the moment. Ms. Lake was given several of these opportunities while at the National Office.

### Ms. Lake's Tax Shelter Experience Under Mr. Hironaka

Ms. Lake came to the National Office as a GM-14, to have a major responsibility for tax shelter policy and enforcement. The position assured contact with top management. It offered high visibility and full opportunity to travel nationwide, instructing and gaining information in the tax shelter field. Her prior distinguished performance, experience and CPA degree resulted in her being sought out to take on responsibility in this growing field of criminal tax law enforcement. Richard Wassenaar, then the head of CID, with the concurrence of Stephen Hironaka, was responsible for singling her out and making this special opportunity available without competition.

Ms. Lake accepted and was assigned to the U.S. Tax Planning Service project under the direct supervision of Mr. Hironaka. Within a short time she became suspicious

of CID officials and concerned that she was being treated unfairly because of her sex and commenced preparing a private running diary noting her version of daily events which she felt reflected her unfair treatment.[6] Her concerns escalated because of a serious personality clash with Mr. Hironaka, who required strict attention to detail, sought to assure policy documents were highly polished, and expected precise compliance with rules and regulations generally. He found her often petty complaints annoying and she distrusted him from the outset.

The job of Senior Coordinator for tax shelters was a major assignment. Immediately after starting the work Ms. Lake travelled extensively to the field. Ms. Lake and Mr. Hironaka soon tangled over her expense vouchers which he had to approve and send on for payment. She was running short of money but her vouchers lacked the detailed justifications the complex, and perhaps unreasonable, travel reimbursement regulations of CID required. Mr. Hironaka insisted her vouchers be correctly submitted and she became angry, going over his head to supervisors with many complaints. While Ms. Lake admits Mr. Hironaka's strict processing of her travel vouchers was not based on her sex, as he required precision from all subordinates, Ms. Lake claims he escalated the disagreement into a major dispute in a way that would not have occurred with a male analyst. Her view of the conflict is wholly subjective. She overlooks entirely her own exacerbating conduct in constantly complaining even after deficiencies in her vouchers were remedied. Far more significant to her sex discrimination claim is the fact that Mr. Rankin and other supervisors helped her by expediting vouchers and offering money to tide her over. Nonetheless she remained openly exasperated and uncooperative and an unfavorable view of her interpersonal relations skills emerged.

Because of the growing amount of work in the tax shelter area, top management had decided on Mr. Hironaka's recommen-

dation, even before Ms. Lake arrived for the job, that it would be advisable to bring in another analyst. George Scott was selected. He came on board from the field shortly before Ms. Lake. Ms. Lake had not been consulted. Mr. Scott was designated Junior Analyst and was told to report to Ms. Lake. Ms. Lake resented this unreasonably. She thought Mr. Scott was unqualified and believed she should have been consulted. From the outset she irrationally believed that Mr. Scott was after her job. As matters progressed Ms. Lake was in constant friction with Mr. Hironaka over Mr. Scott. She irrationally felt Mr. Scott was usurping responsibility for her work when he made some changes in one of her memos at the direction of Mr. Hironaka while she was out of the office on sick leave. She believed Mr. Hironaka was assisting Mr. Scott and blocking her because of her sex, disregarding her uncooperative attitude. She believed Mr. Hironaka sought Mr. Scott's advice more than hers and gave him more interesting assignments, and she was affronted when Mr. Hironaka did not give her acting assignments to replace him when he was away from the office. Her concerns had some basis in fact, but she blew them up all out of proportion since her own attitude was primarily the cause of what was taking place.

There came to be a near-total breakdown of communication between Mr. Hironaka and Ms. Lake. She was away a great deal, in travel status or ill, and was curt and unresponsive when they met. Mr. Hironaka testified he did not appreciate her manner and freely acknowledged that forty percent of the fault was his. To the extent he showed preference for Mr. Scott, who also experienced difficulties attempting to work with Ms. Lake, it was not her sex but her personality that motivated his conduct. Ms. Lake's claim that Mr. Hironaka resented her because they were of the same grade level and thus in competition is frivolous.

By February 1984, Ms. Lake told supervisors she was frustrated and asked them to

---

**6.** During discovery Ms. Lake withheld much of this material entirely or until a very late stage.

help her return to the field. She was depressed, performing poorly and thinking of resigning. She still had the support of top supervisors who had brought her to Washington. They counseled her to stay a longer time before going to the field because a short stay might be held against her as she sought to move up the management career ladder. She mistakenly took this sound advice as evidence of sexual harassment and became increasingly volatile as aspects of her performance came under review during the selection process for other field positions she sought.

Ms. Lake had conversations with Mr. Hironaka, Mr. Wassenaar and Mr. Rankin, back and forth, complaining about her problems and rehashing old complaints, even after they had been resolved. She took special umbrage to a performance evaluation by Mr. Hironaka which was not favorable to her managerial potential but was well-deserved, based on her handling of her problems as revealed by the record.

Ms. Lake claims that at this juncture Brian Wellesley, her second-level supervisor, told her in February 1984 that she was a troublemaker, that she should not socialize with co-workers, and that she was career dead. This version is denied by Mr. Wellesley, by Mr. Hironaka, who was present, and by contemporary, somewhat self-serving memoranda. It is also contradicted by subsequent events as will become apparent. Whatever happened, however, Mr. Wellesley's comments were not directed to her sex but, rightly or wrongly, were directed to her personality, her inadequate interpersonal relations skills, and her rigidity and inconsistency. Ms. Lake had been encouraged to take the job, had arrived at work only in August 1983, and had been much of the time out of Washington. Her performance obviously had not lived up to expectations. She had done some good work but her constant complaints, mostly petty and unjustified, her continued inflexibility, and her lack of understanding of her own weaknesses, deprived her of the leadership role it had been hoped she would fill.

## Ms. Lake's Failure to be Selected For the Positions

Following this unimpressive entry to the National Office, Ms. Lake sought to gain an appointment away from Mr. Hironaka where she felt she could use her skills. She claims she was prevented by sex discrimination at every level from obtaining the assignments she sought when vacancies were announced.

Ms. Lake does not challenge the basic system for career management selection that has been previously described. She was always found well qualified for the assignments she sought and she was always interviewed. She contends, however, that her performance ratings and interview appraisals were slanted against her because of her sex, and that because of her sex she was also denied temporary detail assignments to facilitate her selection for positions away from the National Office. These issues will now be examined.

### A. The Regional Representative Selection

In 1982 the National Office established three Regional Representative positions. These are liaison positions in which a Regional Representative is responsible for transmitting information on significant prosecutions and policies between the National Office, one or more Regional Offices, the Criminal and Tax Divisions of the Department of Justice, and the Chief Counsel's Office of IRS. It is a highly visible job that offers prospects of advancement and places heavy emphasis on interpersonal skills and experience.

A vacancy opened up for one of these positions in April 1984 and Ms. Lake applied when it was advertised. Eight applicants were evaluated, including Ms. Lake and another woman. Ms. Lake was one of two applicants with GM-14 status. She wanted the position because it would bring her into contact with the field and at the same time she would be dealing at the top levels of CID on significant matters. Mr. Rankin and Mr. Wassenaar interviewed each applicant and decided not to select anyone in May 1984. The vacancy was not

readvertised. It was later filled under circumstances that will be described.

When Ms. Lake initiated her EEO proceeding in November 1984, claiming she was not selected in this instance because of her sex, Mr. Rankin indicated that in evaluating the applicants for the position he and Mr. Wassenaar had focused on the three applicants with previous experience in the field, including Ms. Lake, who had obtained her field management experience during her second tour of duty at Oklahoma City as Group Manager. He indicated they were not satisfied with the experience level of the candidates and therefore decided not to select the position.

Ms. Lake claims this statement was pretextual, arguing she had the most recent substantial field experience and had been a good manager, and suggesting that Mr. Rankin and Mr. Wassenaar decided not to select the position to avoid giving her the position. However, in June 1984 Ms. Lake was detailed to a Regional Representative position for a period not to exceed 90 days. On August 13, 1984, she was designated Acting Chief of the Milwaukee District Office to serve until September 17th. Mr. Wassenaar admittedly told her she would be a Regional Representative upon completion of her Milwaukee assignment. Because of her grade she could have been assigned to the job noncompetitively. All of this would appear to have been an effort to enhance Ms. Lake's qualifications prior to her being selected as a Regional Representative.

■ Mr. Rankin had always been sympathetic to Ms. Lake's advancement and had on several occasions counseled with her sympathetically and assisted her during her troubles with Mr. Hironaka; he impressed Ms. Lake as an ethical and fair person.[7] Mr. Wassenaar became terminally ill prior to the trial and was not deposed. Ms. Lake acknowledges he was the one who had sought her out and brought her to the National Office because of her skill and she admits he promised her the Regional Representative job beginning in September

1984. Moreover, as will appear, Mr. Wassenaar acted to improve her personnel paperwork to aid her applications for other positions and offered her a significant temporary detail as Assistant Chief of Foreign Operations. Although Mr. Wassenaar's testimony was not available, in reponse to Ms. Lake's EEO complaint he filed an affidavit in June 1985 which corroborates Mr. Rankin's testimony. It referred to Ms. Lake's interpersonal relations problems and stated that she had returned to the National Office before completing the Milwaukee assignment and advised him she did not desire to return to the Office of Investigations and that after completing the assignment she would like to be assigned to the Office of Planning and Development. Given all these facts and circumstances Ms. Lake failed to establish by a preponderance of the evidence that the original decision not to select was pretextual.

The Court finds that Ms. Lake would have been appointed a Regional Representative had she not misinterpreted what was taking place because of her warped perspective and ended up declining the opportunity, perhaps on the advice of her counsel, when it became available about the same time she filed her EEO complaint in November 1984. Her suspicions appear to have clouded her judgment. Ms. Lake suspected that a man was going to get the job. She focused on Johnny Rose, Group Manager at Memphis. He had heard of the vacancy after the nonselection and had made known his interest in the position. He was assigned to the Office of Planning and Development in the National Office on August 3, 1984, effective September 30, 1984, pending opportunity to apply to serve as Regional Representative if a vacancy was announced. He had encountered an unexpected opportunity to sell his house in Memphis and had asked for the reassignment at that time. Office rumor had it that he had been preselected and would get the vacancy. This was not the case. Although Mr. Wassenaar had told Ms. Lake

---

7. The Court sharply questioned Mr. Rankin to test his testimony on this issue and was satisfied that his attitude was as indicated by these findings.

she had the job, she chose to believe the rumors. No promise had been made to Mr. Rose, as his testimony and personnel records confirm. All that had happened was a decision to bring Mr. Rose to the National Office in another position having in mind his longer-term interest in filling a Regional Representative job.

When Ms. Lake stated in September 1984 that she no longer wanted the Regional Representative job, her supervisors still sought to help her but she insisted on going to the Office of Planning and Development where she knew she faced a bland, unchallenging assignment. Mr. Rankin tried to dissuade her, pointing out she could go back to tax shelter work without having to deal with Mr. Hironaka, who was about to be rotated into a different area of work as a section chief. She held her ground and went to the Office of Planning and Development. To accommodate Ms. Lake, Mr. Rankin had a vacancy created by arranging the transfer of Mr. Rose from that office noncompetitively into the Regional Representative slot. In an effort to settle the EEO complaint brought by Ms. Lake, on February 6, 1985 CID officials again gave her an opportunity to take the job. She refused. As will appear with great clarity, she wanted to leave the National Office, although she claims she liked many people there, and the Regional Representative job would have tied her to Washington.

## B. The Dallas Group Manager Selection

Two other vacancies occurred in this same period for which Ms. Lake applied but failed to be selected. In June 1984, when she had been detailed as a Regional Representative gaining experience in that role, she applied for a vacancy—GM-14 Group Manager—back at the Dallas District Office. She was one of two best qualified and was interviewed. Daniel Gietl was the other candidate and he was selected.

The interview panel consisted of Mr. Shepard, who had become Assistant Regional Commissioner for the Southwest Region, Ted Brown, Chief of the Dallas District Office, and Robert Sawyer, Assistant

Director of the Dallas District. Ms. Lake did not protest Mr. Shepard's presence, although according to her testimony she no longer liked him or trusted him and thought that, in addition to raping her, he had tolerated and condoned open sexual harassment in the Dallas District Office when it was under his supervision.

Mr. Shepard, on the other hand, was unaware of Ms. Lake's rape charge against him or of her distaste for his earlier conduct. He apparently played a relatively minor part in the selection compared to that of the other two members. His subsequent account of the interview to Mr. Rankin, his supervisor, was considerably more favorable to Ms. Lake than that given by the other two panelists in their testimony at trial. He believed she had a good interview but that her rating papers from prior jobs needed to be cleaned up.

As with all competitive promotions, the panel examined personnel records of the applicants prior to interview. These records included evaluation materials, Reports of Managerial Potential, Merit Pay Appraisals, and Management Career Panel Rating forms. As a consequence of Ms. Lake's difficulties with Mr. Hironaka and the limited time she had been dealing with him, Ms. Lake's file did not rate her in two areas she had not dealt with since her Oklahoma City service, and contained some unfavorable information and appraisals. In an effort to assist her, Mr. Rankin had made changes to update and partially alleviate Ms. Lake's concerns and directed that the earlier material be destroyed. But the unrevised papers had already been sent to the panel in regular course for study prior to the interview. Because the panel had already read the prior appraisals containing more unfavorable material, they remained in her file. These were particularly negative as to her interpersonal relations skills. These skills became the focus of the interview when she inaccurately advised the panel at the very outset, in response to a general warmup question, that her principal strength was her ability to work well with her supervisors and staff. The Court accepts as credible Mr. Sawyer's account of

what then ensued. She was confronted with the negative comments in her file and taken off guard. She made a poor impression on him.

Mr. Gietl had a more positive interview. He had been an agent in six districts, had performed well on individual assignments and was effective in groups. In addition, he had worked two years as a National Office Project Coordinator. The panelists knew his work favorably. In some respects he had superior qualifications and had the advantage of being a "home grown" candidate, while Ms. Lake had superior qualifications in some other respects. His superior ability to deal with people tipped the balance.

Ms. Lake lost because of the interview, which disclosed her personality deficiencies, not because of her sex, and she lost in spite of strong support from Mr. Rankin. She was encouraged by Mr. Shepard and others toward another opening in the San Antonio District Office as Group Manager, GM–13/14, in which she would have retained her pay level while gaining additional field experience at the GM–13 management level, but she refused to apply.

Throughout the various adjustments, changes and explanatory comments made in her personnel papers, Ms. Lake never ranked better than good, with need to improve, under Personal Relations. While other qualifications were higher, *i.e.*, outstanding or very good, the lower Personal Relations rating harmed her chances in the severe competition. Ms. Lake correctly notes that in view of the expected keen competition for this position and the others, documentation of work performance is supposed to be comprehensive and supportive and that the reports concerning her interpersonal relations skills were unfavorable in this context. But these reports were more than fair under the circumstances and no proof was presented that males with comparable interpersonal difficulties, if there were any, were written up more favorably. In sum, the higher Ms. Lake sought to rise in management the larger her clear deficiency in interpersonal relations skills, which was unrelated to her sex

but repeatedly demonstrated, loomed as a significant obstacle.

## C. The Assistant Chief, Laguna Niguel, Selection

The final position Ms. Lake applied for was that of Assistant Chief in the District Office in Laguana Niguel, California. This GM–14 position became available through vacancy in September 1984 when Ms. Lake was completing her temporary Milwaukee assignment, and she applied at the suggestion of Mr. Rankin. She had told Mr. Rankin she wanted to go back to the field. Again she was found to be one of two best qualified, along with a man, and accordingly was scheduled for interview. The man, Robert Pledger, was selected on the recommendation of the panel which included the Chief of the office, who was especially interested in female and minority applicants for the job.

Mr. Wassenaar assisted Ms. Lake with this selection by including more favorable comments based on her recent work experience, although she was still not satisfied. The following comments appeared:

> Feedback from those who [attended plaintiff's presentations] were positive and her presentations were clear and persuasive.

> For the past 60 days, Ann has been detailed to assist the Southwest and Western Regions as their representative in the National Office. In her capacity as a Regional Representative she has maintained an effective relationship with her colleagues and superiors.

Def. Ex. 34Q. Her overall rating was very good.

At her interview, Ms. Lake, even by her own admission and in the view of each panelist, flunked a highly material ethical question pertinent to the job for which she was applying. Also, as was the case when she applied for the Dallas job, her limited knowledge of field problems emerged. Ms. Lake entered the interview with negative expectations and admitted it had gone poorly. Mr. Pledger, by contrast, responded correctly to the ethical question, was also highly qualified in the field, had advanced training in business administration and had

completed a year of law school. He was not preselected. Ms. Lake lost out at the interview but not because of her sex.

### Constructive Discharge Allegations

■ A crucial issue in this case is whether or not Ms. Lake has shown by a preponderance of the evidence that her resignation on July 6, 1985 was in fact a constructive discharge rather than a voluntary departure. Unless she has met this burden she cannot recover damages since the law otherwise requires her to remain employed while resolving discrimination claims. *See Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir.1981).

The complaint recites that "Ms. Lake's superiors engaged in a course of conduct which was deliberately designed to create an intolerable working environment for her, thereby compelling her to resign involuntarily." Second Amended Complaint, ¶ 37. It further details this issue by claiming that her superiors diminished her work assignments and responsibilities, monitored and evaluated her work negatively, told her she was a "problem employee," was a "negative force," not a "team player," "career dead" and was not to socialize with other employees. As prior findings indicate Ms. Lake turned down favorable work assignments and greater responsibility and failed to establish that her superiors took the positions indicated in these recitals.

It should also be noted that Ms. Lake's EEO complaint was filed in November 1984, although the attitudes attributed to her superiors according to her recollection and the documents climaxed in alleged discussions with Mr. Wellesley and Mr. Hironaka in February 1984 or with Mr. Wassen-

aar in August 1984. Ms. Lake did not raise in her initial EEO complaint, or at any time thereafter administratively,[8] her alleged intolerable working conditions. The Court however passes over the difficult question whether Ms. Lake is barred from raising a claim of constructive discharge under these circumstances by having failed to raise it specifically at the administrative level,[9] and giving her the benefit of the doubt proceeds to consider the merits of the constructive discharge claim, which were fully tried.

■ To establish constructive discharge Ms. Lake must show that CID officials deliberately made her working conditions in the National Office so intolerable that a reasonable person in her situation would have concluded she was forced to resign. *See Clark, supra*, at 1173–74; *Downey v. Isacc*, 622 F.Supp. 1125, 1132 (D.C.C.1985). *See also Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir.1980). Under this "reasonable person" test it is not enough that Ms. Lake actually and subjectively viewed her working conditions as intolerable; her situation must be measured by more objective standards. *See Downey, supra*, at 1172. Moreover, to demonstrate intolerable conditions Ms. Lake must, in a situation such as she was in, do more than prove an actionable instance of discrimination. There must be "aggravating factors," such as continuous and pervasive discriminatory treatment spanning a substantial period of time. *Clark, supra*, at 1173–74.

■ Ms. Lake has failed to carry her burden of proof on this issue by a prepon-

---

8. In February 1985 Ms. Lake filed an amended EEO complaint, adding a count alleging discrimination in the selection for an Austin District position, which was subsequently withdrawn.

9. The issues Ms. Lake may raise "are limited to those within the scope of the administrative investigation which grows or could reasonably be expected to grow out of the administrative charge of discrimination." *Miller v. Smith*, 584 F.Supp. 149 (D.D.C.1984); see also *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970). Ms. Lake has presented no evidence that EEOC knew she contemplated terminating

her employment because of sexual harassment or any other alleged intolerable and deliberately created condition, or that her resignation was for this reason. This therefore is a constructive discharge case which has not been first presented administratively and her claim may well be barred. *See, e.g., Ong v. Cleland*, 642 F.2d 316, 320 (9th Cir.1981); *Rendon v. District of Columbia*, No. 85–3899, slip op. at 7–8 (D.D.C. Nov. 19, 1986), [Available on WESTLAW, DCT database]. *Cf. Jeter v. Boswell*, 554 F.Supp. 946, 948–49 (N.D.W.Va.1983) (making exception for claim of constructive discharge in retaliation for filing of EEOC charges).

derance of the evidence. Prior to her resignation, Ms. Lake had been working at her own request for the last ten months in the Office of Planning and Development of CID, receiving approximately $51,000 per annum. She explained her resignation at the time to Charles Gibb, her second-line supervisor in that office. In June 1985 Mr. Wassenaar had suggested she be given a further development opportunity of several weeks by assigning her to act as Assistant Chief of the Foreign Operations District in Washington, D.C. When Mr. Gibb informed her of this Ms. Lake refused the assignment, stating she intended to resign. They discussed her reasons.

She said she had been treated fairly in the Office of Planning and Development and her assignments were comparable to those of the male analysts but she felt the work was too clerical and routine. She emphasized she had expected and strongly desired to have tax shelter responsibilities, but had become unhappy with Mr. Hironaka because of their personality conflict. Consequently, she was not doing the work she was originally hired to do and wanted to do. Ms. Lake admits that after the first six months in the National Office she wanted to leave and had not tried to stay. Her only specific reference to sexual harassment at the time she resigned was a short reference to her experience in Dallas during her first tour of duty many years previously.

At the time of her resignation and for a time earlier she had been under the care of a psychiatrist. She was mentally depressed. She was advised by the psychiatrist to change her environment because of the stress she was under and to seek out a support system. She felt that people were peering at her around corners, whispering about her and listening to her telephone calls. There is no doubt she had lost confidence in herself, and had no interest in what she was doing. After a most promising start her work expectations had not been realized. Now she was over age 40 and her management ambitions were slipping away. She was a most unhappy, troubled person.

It is impossible to conclude on these facts she was acting rationally. She had won an excellent EEO settlement giving her a position she had wanted with all attorneys fees paid. She refused. She refused to go back to tax shelter work even with Mr. Hironaka no longer there. When a promising development opportunity came to her she refused. Her working conditions were non-discriminatory.

Ms. Lake was a victim of her personality traits and instability. Those who tried to assist her were rejected because she suspected ulterior purposes. She lacked insight. She ignored the truth of what supervisors sensed were her weaknesses. She made no effort to improve her interpersonal relationships or to make her colleagues aware of her inner problems and seek help. As she stated at the time of her first resignation, Ms. Lake had encountered hostility to her sex and sexual harassment at various stages of her prior employment in private industry. These experiences, coupled with her Dallas experience, undoubtedly operated to distort her perceptions. The Court is unable to escape its clear impression that from the moment she arrived at the National Office she embarked on a deliberate plan to expose the blatant sex discrimination that for some reason she believed would be present, and accordingly incorrectly interpreted every event that occurred as confirmation of her misguided preconceptions.

There is conflicting evidence concerning some apparent instances indicating sexual insensitivity at the National Office. There was resistance to women in some offices which, in some instances, made it more difficult for women to obtain acting assignments or other details to develop experience and increase their prospects for promotion. But Ms. Lake was given a number of these details to advance her career. Some low-level supervisors with whom Ms. Lake sometimes came into contact in the National Office were insensitive to female aspirations and attitudes, and on rare occasions they appeared to condone reported isolated acts by others that should have been discouraged. But there was no blatant, coarse harassment at the National

Office such as had existed at Dallas when Ms. Lake was there many years before. Moreover, of far more significance to any female employee, high-level supervisors in Ms. Lake's case were keenly aware of their legal obligation to prevent harassing or other discriminatory behavior, they embraced this obligation affirmatively, and they actively encouraged entry and advancement of females. Ms. Lake's experience illustrates this in several ways. She was sought out and brought into the National Office because of her exceptional skill. When she needed funds because her expense vouchers were inadequate, high-level officials assisted her. When openings occurred she was encouraged to apply. She was given excellent temporary assignments. Long after her interpersonal difficulties surfaced these supervisors spent hours talking with her, trying to get her on track. She rejected constructive advice. Perhaps because of her fixation or illness or both, it all failed.

Given the circumstances outlined above, the Court finds that Ms. Lake's resignation was not in any way caused by any form of aggravated or overt sex harassment or discrimination, nor did CID management officials seek in any other way to make Ms. Lake's working conditions difficult in an attempt to force her to leave. Ms. Lake's resignation reflected primarily the needs of her medical condition and her early firm decision to quit the National Office when she did not continue tax shelter work and advance promptly to higher management levels. It was also irrational. She has not established by a preponderance of the evidence that she was constructively discharged.

### Conclusions of Law

It has been difficult and sometimes impossible to determine the precise extent to which Ms. Lake's version of events is based on fact, given the frequent instances in which her preconceptions and suspicions have distorted or exaggerated events recounted in her testimony. As to every material fact concerning her service at the National Office, she has been directly contradicted by testimony and often by con-

temporary exhibits. That she probably believed much of what she said at a given moment on the witness stand appears obvious but her statements were distorted. Within her own account there are convenient inconsistencies and contradictions that cannot be explained and the heavy weight of the proof demonstrated her unreliability. The Court has substantially discounted crucial aspects of her testimony while, at the same time, attempting to weed out the truth after weighing opposing testimony where full candor on both sides occasionally seemed lacking. While this balancing process has been difficult due to the detail and variety of the claims, the clear weight of the proof which has emerged strongly favors the defense on all decisive issues of fact.

On the record as a whole, Ms. Lake was unable to meet her ultimate burden of demonstrating that CID officials intentionally discriminated against her, *see Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ As noted, Ms. Lake did establish as to each nonselection a prima facie case raising an inference of discrimination, *see id.* at 253–54, 101 S.Ct. at 1093–94; *Freeman v. Lewis*, 675 F.2d 398, 400 (D.C.Cir. 1982). The Secretary dispelled this inference by his showing of legitimate, nondiscriminatory reasons supporting her nonselection in each instance, *see Burdine, supra*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95, as previously discussed.

■ Ms. Lake failed to counter this showing with proof sufficient to meet her ultimate burden of persuasion on the issue of intentional discrimination, either indirectly by showing that the Secretary's reasons are unworthy of credence and are only pretext, or directly by showing that a discriminatory reason more likely motivated CID officials, *see Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Cuddy v. Carmen*, 762 F.2d 119, 123 (D.C.Cir.1985). The Secretary has demonstrated that the reasons offered for Ms. Lake's nonselection for the three positions were not pretextual. Although in some cases the use of highly

subjective criteria in promotion decisions, even to management authority, may raise concerns of sex discrimination, *see, e.g., Davis v. Califano,* 613 F.2d 957, 965 (D.C. Cir.1979); *Hopkins v. Price Waterhouse,* 618 F.Supp. 1109, 1117–19 (D.D.C.1085), the standards employed by CID for the positions sought by Ms. Lake were clearly reasonable. Such decisions by their own nature cannot be completely objective, *see Davis, supra,* 613 F.2d at 965, and the use of personnel data and a detailed performance rating filled out by supervisors, supplemented by a genuine interview, introduced only a moderate degree of subjectivity into the decision process.

Ms. Lake failed to establish independently that her nonselection can be accounted for by any other discriminatory reason. The proof as a whole totally fails to establish by a preponderance of the evidence any motive or intent to discriminate against Ms. Lake by reason of her sex at any time, or any general tendency to allow sexual bias to play a role in employment decisions. Indeed, the proof affirmatively demonstrates the contrary with respect to the Secretary's top supervisors and their implementation of policies that governed the National Office and Ms. Lake's career there. Nor does the proof suggest the existence during the relevant time period of a sexually discriminatory or hostile work environment in violation of Title VII, *see Meritor Savings Bank v. Vinson,* —— U.S. ——, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986), which could support an inference that Ms. Lake was discriminated against in the three promotions involved. Her experience during her first tour of duty has no probative value on this issue, nor on the issue of constructive discharge.

■ Although statistical proof may in certain cases be probative of whether discriminatory intent exists, *Davis, supra,* 613 F.2d at 965, the proof presented by each party in this case is entitled to little or no weight. The competition between males and females had not during the time period relevant to this case been of sufficient duration or scope at CID at the management levels to measure statistically each of the factors that sound nondiscriminatory managers could legitimately consider in making partially subjective decisions when selecting among highly qualified candidates for supervisory and managerial jobs. Overall statistical differences have little significance, given the element of chance and the highly decentralized and individualized nature of CID's promotion and management selection process. Contrary to Ms. Lake's claims, no statistically significant difference was demonstrated in promotion rates of males and females when viewed on an office-by-office basis.

The complaint is dismissed, with prejudice, for failure of proof on all issues. The Clerk of Court is directed to enter judgment for defendant. Defendant shall have costs.