Catherine A. BRODERICK, Plaintiff,

v.

David S. RUDER, Chairman, United
States Securities and Exchange
Commission, Defendant.

Civ. A. No. 86–1834.

United States District Court,
District of Columbia.

May 13, 1988.

See also 117 F.R.D. 306.

Beville May, Boston, Mass., for plaintiff.

Elizabeth Stein, S.E.C., Washington, D.C., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

Trial of the above-captioned matter took place from June 22, 1987 through July 1, 1987. In addition to the oral testimony of some twenty-five (25) witnesses, there has been extensive discovery on both sides in the form of depositions and documents. The matter has been fully briefed. On the basis of the foregoing submissions, the Court enters the following Findings of Fact and Conclusions of Law.

### Findings of Fact
#### The Parties

1. Plaintiff, a 35 year-old white female, is currently employed as a staff attorney in the Division of Corporation Finance of the Securities and Exchange Commission ("Commission" or "SEC"). She has been continuously employed as a staff attorney since August 12, 1979, a period of more than eight years. She filed this action on June 30, 1984, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–16, *et seq.*, asserting two causes of action. These are, 1) that defendant is responsible for creating and refusing to remedy a sexually hostile work environment at the Washington Regional Field Office ("WRO") of the SEC, and 2) that plaintiff's supervisors at the WRO retaliated against her for opposing actions of the WRO's· management that she considered to be illegal under Title VII.

2. Defendant, David S. Ruder, is Chairman of the SEC, having succeeded John S.R. Shad, who was Chairman during the events in controversy. Mr. Ruder is sued in his official capacity.

3. The SEC is a government agency charged, *inter alia*, with the regulation and enforcement of the federal securities laws, among them the Securities Act of 1933 and the Securities Exchange Act of 1934. The SEC's functions are exercised through several field offices, including the WRO located in Arlington, Virginia.

#### The Organizational Structure Of The WRO Was Organized

4. At all times in question, the WRO, a small branch of the SEC, was organized into two main parts: 1) the Regulation side, responsible for reviewing corporate filings and conducting examinations of broker-dealers and investment advisors, and 2) the Enforcement side, responsible for investigating possible violations of the federal securities laws, such as insider trading. The Enforcement and Regulation Divisions were further sub-divided into branches.

Prior to 1980, the WRO Enforcement Division contained two branches. In the fall of 1980 a third enforcement branch was created.

5. The chief executive of the WRO was the Regional Administrator. He had three immediate subordinates, each an Assistant Regional Administrator ("ARA"): two worked in the Enforcement Division in the Arlington and Philadelphia Offices, respectively, and one worked in the Regulation Division. There was also a Regional and a Senior Trial Counsel responsible for civil litigation and administrative proceedings.

6. Paul Leonard ("Leonard") was Regional Administrator of the WRO from 1976 until he retired in August 1985. James C. "Cliff" Kennedy ("Kennedy") was ARA for Enforcement in Arlington from 1976 until May 1986. John L. Hunter ("Hunter") was a branch chief in the WRO from 1976 until September 1980, when he became Senior Trial Counsel. In September 1982 he became Regional Trial Counsel, a position that he held until May 1986. Herbert Brooks ("Brooks") became ARA for Regulation in late February 1981 and held that position until May 1986.[1]

*Plaintiff's Work History At WRO—August 12, 1979 to September 1984*

7. Plaintiff was first employed on August 12, 1979 as a Civil Service Grade 12, step 3, staff attorney. Ms. Broderick's educational qualifications included a Bachelor's Degree with honors from Carnegie Mellon University, a Master's Degree in English, and a Law Degree from the New York University School of Law. Additionally, Ms. Broderick has completed half the requirements for a Master's Degree in Securities Law at Georgetown University. Ms. Broderick is admitted to practice law in both New York and the District of Columbia. While a student, she clerked for the Honorable John R. Bartell of the United States District Court for the Eastern District of New York. She also clerked for the United States Attorney's office for both the Southern and Eastern Districts of New York.

8. Plaintiff served as a staff attorney in the Enforcement Division from August 1979 until September 1984, when she was transferred to the Division of Corporation Finance. During this entire period she received one promotion to grade 13, step 1. Because of her length of service, she met the eligibility qualifications for promotion to grades 14 and 15.

9. During her five years of service with the Enforcement Division, plaintiff served under the following immediate supervisors for the periods indicated:

John Hunter, branch chief, for one week in August 1979

Richard Wachterman, branch chief, August 1979 to November 1980, when he left the SEC

Terry Miller, branch chief, December 1980 to August 1981

Hilton Foster, branch chief, shortly after August 1981 to August 1984, when plaintiff was transferred to the Division of Corporation Finance

10. Mr. Wachterman testified that plaintiff worked on one large insider trading case, that her work was substandard, that she took an excessive amount of time to complete her assignments, and that she did not take kindly to criticism. The negative effect of Mr. Wachterman's testimony was substantially undermined by the fact that he, in recommending plaintiff for promotion to GS-13, stated, *inter alia*, that "[i]n all her work, she demonstrated a high level of professionalism, especially in her ability to express herself orally and in writing." The memorandum also stated that "Ms. Broderick assumed primary responsibility for a significant part of this investigation. She assimilated a mammoth record which had previously been developed, pursued investigatory initiatives on her own, and wrote a memorandum recommending enforcement action. Her effort in this case has substantially furthered the investigation."

11. Ms. Miller testified that in the beginning of August 1980 she and plaintiff

---

1. The WRO closed in May 1986 and some of its functions were assigned to the new Philadelphia Regional Office which encompasses the same geographic area.

had a cordial relationship, but that thereafter she had the same problems with plaintiff that Wachterman had had—*i.e.*, plaintiff's tardiness and inability to accept criticism arising from Miller's editing of her work. After seven months under Miller, plaintiff asked Kennedy for a transfer because of Miller's criticism of her work and "unfairness". Plaintiff remained under Miller's supervision until August 1981.

12. Mr. Hilton Foster was plaintiff's branch chief from August 1981 to August 1984. This period of three years was the longest single period of supervision by the same person and provides the most complete view of plaintiff's performance capabilities and her difficulties with the management of WRO.

13. During this period of approximately three years, the relationship between plaintiff and Hilton Foster ranged from one of mutual respect during the first year, to one of animosity at the end. At the outset, Foster knew that members of management, including Hunter and Kennedy, were unhappy with plaintiff and that they and plaintiff had a mutual distrust for each other. Foster was well aware of plaintiff's complaints about partying and socializing at the WRO, the plaintiff having so expressed herself to him on several occasions. He was aware that Hunter had "bad mouthed" plaintiff, as well as Karen Nelson, a secretary. Foster told plaintiff in the beginning that he would attempt to act as a buffer between plaintiff and management. Foster's first performance appraisal in August 1982 indicated that plaintiff's performance was "superior" in every way, with the exception of the category entitled "Interactions with supervisors". At that time, Foster felt that she had the potential to be a good attorney and that her one deficiency related to "her inability to act in deference to management's wishes that all employees in the office consider themselves as members of the same team." In December 1982, Foster assisted plaintiff in obtaining a four-month assignment with the office of the United States Attorney, which lasted until the end of April 1983. Despite this hiatus which took her away from the WRO, plaintiff's relations with Foster upon her return deteriorated and her performance rating of August 1983 reflects this change. Her performance level in every respect, instead of being "superior", was in the "fully meets" category, with the exception of her "interactions with supervisors," which was rated "unacceptable", the lowest possible rating. Foster amplified the latter with the explanation that "Ms. Broderick is a capable worker, but she is a festering morale problem in that she blames the Commission and its management for her inability to obtain employment elsewhere. She is not happy working at the WRO; she does not respect the Commission or her supervisors." Finally he stated that "her current attitude, if not improved, would cause me to recommend that she be fired." The friction between Foster and plaintiff did not abate, but rather escalated. Plaintiff received criticisms from him because of her late arrival at work and her job performance. Frequently she responded at length to these criticisms. Finally, in August 1984, Foster gave plaintiff a performance appraisal of "unacceptable" in two categories and on August 30, 1984 plaintiff was told by Foster that if she did not improve her job performance in the elements noted "unacceptable" she would be subject to discharge. Based on the foregoing, it is clear to us that plaintiff was a capable worker and that her problems arose from her inability or unwillingness to change her attitude toward her supervisors and to be a "team player." She and those in a supervisory capacity harbored deep resentment toward each other. In summary, plaintiff "would not go along, in order to get along."

*Plaintiff's Reasons For Her Inability to Interact With Her Supervisors*

14. Covering the entire period of her employment with the Enforcement Division, 1979 to 1984, plaintiff testified at length concerning her perception that an atmosphere of sexual harassment by persons in positions of management pervaded the WRO. Her testimony was corroborated by other witnesses. Except for her initial encounter with John Hunter, when during her first week on the job, he re-

peatedly importuned her to accept his offer for a ride home, and her being kissed by Leonard at a farewell party for Jack Kiefner at Brooks' house in the spring of 1982, none of the incidents complained of by plaintiff were directed at plaintiff personally, nor did they involve the conditioning of employment benefits in return for sexual favors by plaintiff. Rather, it was the occurrence of numerous other incidents [2] of which plaintiff early on became aware which, for her, created a sexually hostile or offensive working environment. This in turn poisoned any possibility of plaintiff's having the proper professional respect for her superiors and, without any question, affected her motivation and her performance of her job responsibilities.

15. Both plaintiff and defendant presented expert testimony concerning the mental condition of plaintiff. These experts examined the plaintiff at some length and their conclusions are in sharp conflict. Dr. James Titchener, M.D., a psychiatrist, testifying for the plaintiff, diagnosed plaintiff's condition as a dysthymic disorder, a "new term for depressive reaction." In plaintiff's case, he stated "it is a classic sadness, feeling of melancholy, hopelessness ... the discouragement, the demoralization of the office atmosphere in which she had to work." He allied this condition to a "post-traumatic stress disorder" arising from her working conditions,[3] but denied that plaintiff suffered from a paranoid personality disorder. He admitted that plaintiff had developmental and relationship problems prior to coming to the SEC, but stated that these had not reached the level of a clinical diagnosis. Ms. Karen Wagner, a social worker with broad experience, was the plaintiff's other expert. She testified generally on the stress effects of sexual harassment on women in plaintiff's position, with particular reference to the plaintiff's hostile working environment and its effect on the plaintiff and her associates in having to work in such an environment.

On the other hand, Dr. Martin Stein, M.D., also a psychiatrist, diagnosed plaintiff as suffering from a paranoid personality disorder, which he defined as a "selective way that people fall into to deal with stress, insecurity, discomfort within themselves." He stated that plaintiff exhibited the characteristics of a paranoid personality disorder, *i.e.*, a pervasive mistrust and suspicion of all supervisors, refusal to accept responsibility, questioning of loyalty and, *inter alia*, the excessive use of the terms "they" and "team player". Each of these psychiatric experts was highly qualified and had long experience in psychiatric diagnosis.

16. Despite defendant's evidence to the contrary, we decline to make a judgment as to whether plaintiff suffered from a paranoid personality disorder or some lesser mental disorder, except to find that plaintiff was a sensitive person who had adjustment problems before she came to the SEC, that the environment in which she worked exacerbated these problems and that the environment affected her motivation and consequently her work performance. As discussed in Finding of Fact 13, her performance evaluations for 1982, 1983 and 1984 reflect a gradually declining overall rating (from "Superior" to "Unacceptable"), as well as a declining rating in the category of "Interaction with Supervisors" (from "Minimally Acceptable" to "Unacceptable").

17. Plaintiff and others testified at length concerning specific conduct by those in supervisory positions, which in their judgment constituted a sexually hostile work environment. These instances include, but are not limited to, the following:

a. *Leonard*, the Regional Administrator, at an office party, became drunk, and, among other matters, untied plaintiff's sweater and kissed her. He also kissed one other female employee. On another occasion, at an office retreat in Lancaster, Pennsylvania in September 1983, Kennedy approached Patty Toftoy,

**2.** Some of these incidents are related in Finding of Fact 17.

**3.** We decline to accept Dr. Titchener's diagnosis that plaintiff suffered "post-traumatic stress dis-

order." His analogy relating the Buffalo Creek, West Virginia, flood and the Beverly Hills nightclub fire to plaintiff's reaction to a sexually hostile work environment is not convincing.

his administrative assistant, put his hands on her hips, remarking that she had "sexy, wide hips." These facts are not disputed. Plaintiff also testified that Leonard and Regional Trial Counsel Jack Kiefner made sexually suggestive remarks about plaintiff's dress and figure. Leonard, as Regional Administrator, was head of the WRO.

b. *Hunter* admittedly came to plaintiff's apartment during plaintiff's first week with the SEC. Plaintiff testified that he had repeatedly offered her a ride home, and when she finally acceded, he barged into her apartment, and toured the premises, including her bedroom. Hunter testified that he was with his wife, and that the purpose of the visit was to obtain packing boxes. We credit plaintiff's testimony. Nelson testified that Hunter was foul-mouthed and has a penchant for crude and dirty jokes. White corroborated Nelson's testimony. More importantly, Hunter admitted that he had an on-going sexual relationship with Mary Bour, a secretary, from December 1981 to June 1984. In August or September 1983, Hunter was called into Leonard's office and was asked whether he knew that "people in the office were talking about his [*i.e.*, Hunter's] personal life." In fact, according to defendant's witness, Stanley Hecht, Hunter's liaison with Mary Bour "became a matter of common knowledge." This subject again came up at a meeting with Leonard and others in October 1983. During the period from January 1980 to her resignation in November 1984, Mary Bour received three promotions, a commendation and two cash awards.[4] Though Mary Bour was not under Hunter's direct supervision, Hunter admitted he had had a direct input into Mary Bour's performance evaluations. Hunter was never disci-

plined for this conduct, but instead received ten salary increases between October 1983 and January 1987.

c. *Kennedy*—There is no direct evidence that Kennedy, an ARA, had a sexual relationship with Joan Sarles. There is, however, extensive testimony that Kennedy was noticeably attracted to Sarles and that there was extensive socializing between them during business hours, both within and outside the office, and that their relationship was the subject of a discussion in Kennedy's office in October 1983, a meeting at which Hunter was also present. It is also undisputed that Kennedy promoted her career from the time she joined the WRO as a grade 11 employee in March 1982. In three months, she was appointed to a grade 12 attorney position, and approximately one year thereafter, shortly upon becoming eligible, was promoted to grade 13. Six months later, in December 1983, she applied for and received a promotion to Branch Chief,[5] and six months thereafter to grade 14. In summary, Sarles advanced from a grade 11 to a grade 14 in slightly over two years.

d. *Brooks*—There is compelling evidence that Brooks had a sexual relationship with Alice McDonald beginning in early 1983. A number of undisputed incidents confirm the fact that they frequently had long lunches together, occasionally dined and drank together, and jogged together. On one occasion during a luncheon for National Secretaries Week, Alice McDonald, who was in Brooks' company, got drunk and had to be taken home later in the afternoon by Brooks. On another occasion, McDonald accompanied Brooks on a trip to Ocean City, where they spent the night in the same hotel room. Brooks denied having

---

**4.** At the same time, Cheryl White was deprived of her paralegal responsibilities which Hunter, on at least one occasion, assigned to Mary Bour, who was a secretary. As a consequence, White asked Kennedy to be assigned to a new supervisor.

**5.** When this position was opened in December 1983, there were four applicants: Joan Sarles, Ronald Crawford, Aldie Lapins and plaintiff.

The selection panel consisted of Kennedy, Hunter and Thomas Monahan, the ARA for enforcement for the Philadelphia Branch Office. The panel also met with Stan Hecht. Sarles was selected as the best qualified. We are satisfied that this selection was based on merit and that plaintiff's claim of retaliation as it relates to this non-selection lacks evidentiary support.

sexual relations with McDonald on this occasion, but said they spent the night discussing her theological problems. As Brooks put it, "she had some difficulty with the things she had done in the past and her feelings about God and the Catholic Church." McDonald, who joined the Commission in September 1982 as a clerk typist at grade 3 and departed in November 1984, also made rapid progress with the assistance of Brooks, her supervisor. During a single twelve-month period, she received two grade promotions, a $300 cash award and a perfect score in each element of her performance appraisal in 1984.

18. We find that the conduct of Leonard, Hunter, Kennedy and Brooks was a matter of common knowledge throughout the WRO and created an atmosphere of hostile work environment offensive to plaintiff, Cheryl White, Karen Nelson and several other witnesses for plaintiff, whose testimony we deem not necessary to recite in detail.[6]

19. Leonard (by deposition), Hunter, Kennedy and Brooks appeared and testified at trial. With due consideration for the compromising position in which they found themselves, we find that the testimony of Hunter and Kennedy was less than forthright and that Brooks' testimony was in material respects false and incredible. In the face of countervailing evidence, we regard the testimony of all these witnesses as deserving of little credence.

*Subsequent Administrative Proceedings*

20. On February 10, 1984, Hilton Foster sent plaintiff a memorandum concerning her continued failure to meet performance standards.

21. In response to this memorandum, plaintiff, on February 16, 1984, filed a grievance with the Office of Personnel with respect to her February 1984 interim performance appraisal, and an EEO complaint charging sex discrimination. With respect to the latter, the EEO office conducted a

full-scale investigation between April 1984 and January 1985 which included the testimony of twenty-seven witnesses. A consulting firm was then engaged to prepare a draft report, which was submitted to the EEO office in January 1986. The EEO office saw "no nexus between [plaintiff's] complaint and the other activities that were going on in the office", and concluded that there was no reason to believe that plaintiff had been a victim of sex discrimination, sexual harassment and retaliation. The Commission issued its decision on June 4, 1986 [7], denying plaintiff's claims.

22. The final EEO report, a copy of which the Commission sent to plaintiff, concluded, *inter alia,* as follows:

Romantic involvements between supervisors and those working for them have occurred at the WRO, and some of the liaisons were common knowledge to the employees. There were frequent parties, afternoon long lunch "hours", and certain WRO employees went drinking together during the work day. All in all, an atmosphere existed at the WRO where drinking and sexual involvements among staff were not unusual, and where most of it was engaged in by members of upper management.

Specifically, there were relationships going on between John Hunter and his secretary, Mary Bour, and Herbert Brooks, Jr., and his secretary, Alice McDonald, of which most WRO employees were well aware. Impartial witnesses also stated that Mr. Leonard had been romantically involved with Linda Cole, an attorney no longer at the SEC, and that Mr. Kiefner had had liaisons with Debbie Forbes and Helena Wertlieb.

This conclusion submitted by the EEO office fully corroborates the basic gravamen and thrust of the evidence presented by plaintiff at trial.

23. In March 1984, the SEC's Executive Director George Kundahl, pursuant to a memorandum from plaintiff asserting allegations of misuse of government property,

---

6. These other witnesses include Pamela Pass, Jeannine Smail, Patricia Haas Smith and Craig Stanger.

7. The final EEO report was released at the same time.

misuse of government funds, excessive drinking on-the-job and the granting of cash awards and other benefits on the basis of sex, initiated an internal Ethics Inquiry. The Inquiry, which was separate from the EEO investigation, was conducted by Ethics Officer Myrna Siegel and Deputy Associate General Counsel Benjamin Greenspan. These persons interrogated many WRO employees concerning the areas under investigation and prepared affidavits signed by some of those examined. The final results of the Ethics Inquiry were deemed to be privileged and excluded from trial. The affidavits themselves were permitted to be offered. The Inquiry was concluded in 1984 and the results were communicated to Executive Director Kundahl in early 1986.

*The Commission's Knowledge of WRO's Hostile Work Environment*

24. The Commission's Office of Personnel was aware in 1983 of the conditions at the WRO. In September 1983, plaintiff brought these matters to the attention of the Personnel Office when she protested her 1983 performance appraisal. She was advised by James L. Foster, Director of the Commission's Office of Personnel, that "if you feel that you have been unlawfully discriminated against, you should confer with the Commission's EEO office."

25. On February 16, 1984, plaintiff complained to her supervisor, Hilton Foster, in response to the latter's February 10, 1984 letter, stating that "I believe it to be another example of your harassment and discrimination against me because of my sex and because I have brought to your attention instances of sexual discrimination and sexual harassment adversely affecting my and others' work performance in this office."

26. The then-Chairman of the Commission, John S.R. Shad, and Executive Director Kundahl were sent copies of plaintiff's February 16, 1984 memorandum and thus became aware at that time, if not before, of plaintiff's allegations of sexual discrimination and harassment. This was done at the suggestion of Phillip H. Savage, the EEO Office Director at that time,

because of the "nature and seriousness of the allegations." He also advised plaintiff to file a formal EEO complaint. The investigation of the complaint was assigned to Jeffrey Puretz, a staff attorney with the Investment Management Division of the Commission. Plaintiff's EEO complaint, filed February 16, 1984, was amended at least once to encompass events occurring thereafter, including the claim of retaliation stemming from her 1984 performance evaluation.

27. Mr. Savage, who served as EEO Director from 1975 to 1984, kept in touch with the progress of the investigation and frequently discussed plaintiff's allegations with members of Chairman Shad's office, although he was not able to meet with the Chairman. Before the EEO investigation was completed, Savage had recommended to Linda Quinn, Executive Assistant to the Chairman, and James Clarkson, Director of Regional Operations, that the Broderick case be settled. He testified that the guidelines prohibiting sexual harassment which had become effective in 1980 were not being enforced and, in effect, that the top management of the Commission was not interested in this subject. He left the Commission in November 1984 because he felt that his recommendations regarding the settlement of this and similar cases were not being considered and that his influence as Director of the EEO office had been undermined. We credit Mr. Savage's testimony to the effect that the Commission, despite a few important appointments of females to positions of responsibility, made no serious effort to enforce the guidelines prohibiting sex discrimination. Not one of the offending personnel was ever disciplined. One has retired and the others were promoted.

*Conclusions of Law*

*Jurisdiction*

1. This court has jurisdiction over this cause of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. The SEC is an employer within the meaning of Title VII and plaintiff is a woman protected by the statute. Plaintiff has met

the procedural requirements for this court to exercise its jurisdiction over her claims. She timely filed a complaint of discrimination with the SEC's EEO office, the EEO office issued its decision, and the present suit in this court was timely filed.

*Plaintiff's Sexual Harassment Claim*

2. The parties stipulated that the definition of sexual harassment contained in the Equal Employment Opportunity Commission's Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11 (1986), is the definition that should be applied in this case. Section 1604.11(a) defines sexual harassment as follows: "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, . (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) *such conduct has the purpose or the effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.*" (Emphasis supplied.) Additionally, section 1604.11(g) provides that "[w]here employment opportunities or benefits are granted because of an individual's submission to the employer's sexual advances or requests for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who were qualified for but denied that employment opportunity or benefit."

3. The United States Supreme Court recently held that a violation of Title VII may be predicated on either of two types of sexual harassment: (a) harassment that involves the conditioning of concrete employment benefits in return for sexual favors [8], and (b) harassment that, while not directly affecting economic benefits, creates a hostile or offensive working environment.

*Meritor Savings Bank, F.S.B. v. Vinson,* 477 U.S. 57, 62–67, 106 S.Ct. 2399, 2403–06, 91 L.Ed.2d 49 (1986); *see also Yates v. AVCO Corp.,* 819 F.2d 630, 634 (6th Cir. 1987); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987); *Bundy v. Jackson,* 641 F.2d 934, 943–46 (D.C.Cir.1981); *Henson v. City of Dundee,* 682 F.2d 897, 901–02 (11th Cir.1982); *Jones v. Lyng,* 669 F.Supp. 1108, 1121 (D.D.C.1986).

4. A "hostile work environment" claim is actionable under Title VII if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature are so pervasive that it can reasonably be said that they create a hostile or offensive work environment. *Meritor,* 477 U.S. at 65–67, 106 S.Ct. at 2405–06. Whether the sexual conduct is sufficiently pervasive to amount to harassment and create a hostile or offensive work environment must be determined from the totality of the circumstances. *Id.* at 69, 106 S.Ct. at 2407; *Hicks,* 833 F.2d at 415–16. Additionally, Title VII is also violated when an employer affords preferential treatment to female employees who submit to sexual advances or other conduct of a sexual nature and such conduct is a matter of common knowledge. *King v. Palmer,* 778, F.2d 878, 880 (D.C.Cir.1985); *Priest v. Rotary,* 634 F.Supp. 571, 581 (N.D.Cal.1986); *Toscano v. Nimmo,* 570 F.Supp. 1197, 1199 (D.Del.1983); *see also* 29 C.F.R. § 1604.11(g).

5. Evidence of the general work atmosphere, involving employees other than the plaintiff, is relevant to the issue of whether there existed an atmosphere of hostile work environment which violated Title VII. *Vinson v. Taylor,* 753 F.2d 141, 146 (D.C.Cir.1985), *aff'd in relevant part and rev'd in part,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Delgado v. Lehman,* 665 F.Supp. 460 (E.D.Va.1987). *See also Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957,

---

**8.** This is colloquially known as *"quid pro quo"* sexual harassment. Since there is no credible evidence that plaintiff herself was offered economic benefits in return for sexual favors, this type of conduct is not the subject of plaintiff's basic complaint in the instant case, except to the extent that it created and contributed to a pervasive atmosphere of sexual hostility in the work environment.

**1278**

92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). This is so because "[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive." *Vinson v. Taylor,* 753 F.2d at 146.

◼ 6. Ms. Broderick established a *prima facie* case of sexual harassment because of having to work in a hostile work environment. The evidence at trial established that such conduct of a sexual nature was so pervasive at the WRO that it can reasonably be said that such conduct created a hostile or offensive work environment which affected the motivation and work performance of those who found such conduct repugnant and offensive. Ms. Broderick was herself sexually harassed by Leonard, Hunter, Kennedy and possibly others. But we need not emphasize these isolated incidents. More importantly, plaintiff, without any doubt, was forced to work in an environment in which the WRO managers by their conduct harassed her and other WRO female employees, by bestowing preferential treatment upon those who submitted to their sexual advances. Further, this preferential treatment undermined plaintiff's motivation and work performance and deprived plaintiff, and other WRO female employees, of promotions and job opportunities. The record is clear that plaintiff and other women working at the WRO found the sexual conduct and its accompanying manifestations which WRO managers engaged in over a protracted period of time to be offensive. The record also establishes that plaintiff and other women were for obvious reasons reluctant to voice their displeasure and, when they did, they were treated with a hostile response by WRO's management team.

*Plaintiff's Opposition and Retaliation Claims*

7. Title VII makes it an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful practice by this title...." 42 U.S.C. § 2000e–3(a). As this court has rec-

ognized, "'[t]he opposition clause' protects opposition expressed in a wide variety of forms and is not limited to the filing of charges." *Jones,* 669 F.Supp. at 1121–22. *See also Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981); *Novotny v. Great American Federal Savings and Loan Assoc.,* 584 F.2d 1235, 1260–61 (3rd Cir.1978), *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Gresham v. Waffle House, Inc.,* 586 F.Supp. 1442, 1446 (N.D.Ga.1984). Title VII also prohibits an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing ..." 42 U.S.C. § 2000e–3(a).

◼ 8. To establish a *prima facie* case of unlawful retaliation, a plaintiff must show (1) that she engaged in protected activity; (2) that she was subject to an adverse action by her employer after engaging in the protected activity, and (3) that there was a causal connection between the two. *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). *Plannels v. Howard Univ.,* 32 Fair Empl.Prac.Cas. (BNA) 337, 344 (D.D.C.1983); *Jones,* 669 F.Supp. at 1121 (quoting *Segar v. Civiletti,* 516 F.Supp. 314, 319 (D.D.C.1981), *aff'd in part and vacated in part,* 738 F.2d 1249 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985)).

◼ 9. Plaintiff met the first element of her *prima facie* case by showing that she repeatedly protested the hostile work environment at the WRO, and that she ultimately filed an EEO claim because of the office environment. Plaintiff complained to Hilton Foster about Hunter's insistence on giving her a ride and touring her apartment, the ridicule to which he subsequently subjected her and her transfer from his branch. She also told Foster about Hunter's attempt to proposition Karen Nelson and his efforts to get her fired after she rebuffed his overtures. She also informed him about the sexual remarks and gestures management made towards

her and other female employees at the WRO. Furthermore, plaintiff made known her opposition to the Hunter–Bour affair, the Brooks–McDonald affair, the Kennedy–Sarles affair and the employment benefits awarded to these women because of their relationships with members of WRO's management team. Finally, when all else had failed, plaintiff, after more than two years of frustration, filed an EEO charge on February 16, 1984. These activities of plaintiff are clearly protected by Title VII against retaliation. *Jones,* 669 F.Supp. at 1121; *Spence v. Local 1250, United Auto Workers,* 595 F.Supp. 6, 10 (N.D.Ohio 1984); *Garcia v. Rush–Presbyterian—St. Luke's Medical Center,* 80 F.R.D. 254, 262 (N.D.Ill.1978); *Eichman v. Indiana State Univ. Bd. of Trustees,* 597 F.2d 1104, 1107 (7th Cir.1979).

10. Plaintiff met the second element of her *prima facie* case by demonstrating that she was subjected to adverse employment action after she made known her opposition to the WRO managers' conduct: to wit, promotion from GS–12 to GS–13 was delayed without explanation. *Hickman v. Flood & Peterson Ins., Inc.,* 29 Fair Empl.Prac.Cas. (BNA) 1467, 1469 (D.Colo.1982) [available on WESTLAW, 1982 WL 455]. In addition, she was given adverse performance appraisals after she complained about the improper conduct of WRO managers, and she was reprimanded and threatened with termination when her complaints persisted. *EEO v. Atlantic Richfield Co.,* 30 Fair Empl.Prac.Cas. (BNA) 551, 552 (C.D.Cal.1979) [available on WESTLAW, 1979 WL 220]; *Mead v. U.S. Fidelity & Guar. Co.,* 442 F.Supp. 114, 123, 129–130 (D.Minn.1977); *Croker v. Boeing Co.,* 437 F.Supp. 1138, 1195 (E.D.Pa. 1977), *aff'd in relevant part,* 662 F.2d 975 (3d Cir.1981) (en banc), *Griffin v. Michigan Dept. of Corrections,* 654 F.Supp. 690 (E.D.Mich.1982). After she filed her EEO complaint she was given an adverse performance evaluation and transferred to the Division of Corporation Finance.

11. Plaintiff also established the third element of the *prima facie* case by proving that the Commission was aware of the protected activities, and that the adverse actions followed *after* she made known her opposition and *after* she filed her EEO charge. For instance, the complaint of Foster in February 1984 concerning plaintiff's lack of punctuality[9], his threat of discharge and the adverse performance evaluation of 1984 are examples of defendant's retaliation. The proximity of the adverse actions taken against her and her protected activity establishes the necessary nexus to meet the third element of the required *prima facie* case. *Jones,* 669 F.Supp. at 1121; *Gonzales v. Bolger,* 486 F.Supp. 595, 601 (D.D.C.1980), *aff'd,* 656 F.2d 899 (D.C.Cir.1981); *Brown v. Biglin,* 454 F.Supp. 394, 399 (E.D.Pa.1978); *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.,* 425 F.Supp. 318, 324 (D.Mass.1976) *aff'd,* 545 F.2d 222 (1st Cir.1976).

*The Defendant's Failure to Rebut the Prima Facie Case*

12. In the ordinary gender bias case, once the plaintiff has established a *prima facie* case of discrimination or retaliation, the burden shifts to the defendant "to articulate some legitimate non-discriminatory reason" for the actions taken. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Williams v. Boorstin,* 663 F.2d 109 (D.C.Cir.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981). In a sexual harassment case involving the claim of hostile work environment, the burden on the defendant employer is markedly heavier. Once a plaintiff has established a *prima facie* case of sexual harassment or retaliation for opposing sexual harassment, the burden shifts to the employer to rebut the plaintiff's harassment claims and to

---

9. Other employees at the WRO frequently did not report on time. None were even threatened with termination. Punctuality in reporting for work appears not to have been strictly enforced

at the WRO. Similarly, it would appear that the rules governing the length of lunch hours were frequently honored "more in the breach than in the observance."

show *by clear and convincing evidence* that the plaintiff would not have been treated differently if she had not opposed the harassment. *Bundy,* 641 F.2d at 952–53; *Day v. Mathews,* 530 F.2d 1083, 1085 (D.C.Cir.1976); *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 444–45 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). This is a higher standard than that required of an employer in a simple gender discrimination case. *Bundy,* 641 F.2d at 953. The reason for this different rule in sexual harassment cases is that "once a plaintiff establishes that she was harassed ... it is hard to see how an employer can justify [the] harassment." *Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244, 266 (N.D.Ind.1985).

13. In this case, the Commission failed to rebut Ms. Broderick's hostile atmosphere, sexual harassment and retaliation claims by clear and convincing evidence, or even by a preponderance of the evidence. The Commission attempted to meet Ms. Broderick's harassment claims by arguing that Ms. Broderick "was paranoid." Admittedly, plaintiff had problems of personal adjustment before being employed by the Commission in 1979. Whether diagnosed either as "paranoia" or as a "post traumatic stress disorder", we are satisfied that plaintiff's mental condition was caused and exacerbated by the hostile atmosphere in which she worked. Even assuming that the assertion that plaintiff was a paranoid personality has support in Dr. Stein's testimony, it does not rebut similar testimony from other witnesses presented by the plaintiff as to the conditions of sexual harassment and retaliation at the WRO.

14. With respect to plaintiff's opposition and retaliation claims, the Commission's argument that Ms. Broderick's tardiness and her diminished work performance accounted for her performance evaluations and were legitimate reasons for reprimands

and threats to terminate her are not persuasive in the overall context of this case. The Commission's allegations of excessive tardiness when tardiness by others was overlooked is sheer "make weight" and pretext. Ms. Broderick amply demonstrated, through both lay and expert witnesses, that any alleged deficiencies in her work performance, which rested largely on her failure to interact with her supervisors, were directly attributable to the atmosphere in which she worked.[10]

15. Defendant in effect argues that this is a *"quid pro quo"* sex harassment case and, except for isolated instances, plaintiff was not sexually harassed. This contention is in error, and misses the mark. The Commission's attempt to justify the sexual misconduct on the part of supervisory personnel as "social/sexual interactions between and among employees" which Title VII never intended to regulate is unacceptable on the facts of this case. However relaxed one's views of sexual morality may be in a different context, such views do not cover the pattern of conduct disclosed by the record in this case. We hold, and plaintiff has proved, that consensual sexual relations, in exchange for tangible employment benefits, while possibly not creating a cause of action for the recipient of such sexual advances who does not find them unwelcome, do, and in this case did, create and contribute to a sexually hostile working environment.

16. The SEC was the employer of, and had authority over, the personnel who persisted in this activity of which it had actual, as well as constructive, knowledge. It took no action. It is therefore liable under agency principles for the acts of these high-ranking subordinates.

*The Court's Order*

Based upon the entire record in this case, and the Findings of Fact and Conclusions

---

**10.** Plaintiff's diminished performance cannot be asserted as a legitimate basis for her removal when that diminution is the direct result of the employer's discriminatory behavior. *Delgado v. Lehman,* 665 F.Supp. at 467; *Moffett,* 621 F.Supp. at 281; *Weiss v. United States,* 595 F.Supp. 1050, 1057 (E.D.Va.1984); *Lamb v. Drilco Div. v. Smith Int'l,* 32 Fair Empl.Prac.Cas. (BNA) 105, 107 (S.D.Tex.1983) [available on WESTLAW, 1983 WL 517]. *See also Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir. 1982).

of Law set forth above, it is by the court this 13th day of May, 1988,

ORDERED that judgment be and the same hereby is entered in favor of plaintiff for defendant's violation of Title VII of the Civil Rights Act of 1964, and it is

ORDERED that the parties appear for a hearing on the 26th day of May, 1988, at 1:30 PM to consider the appropriate relief to be granted plaintiff.