Guy A. GREEN, Plaintiff,

v.

**KINNEY SHOE CORPORATION, Defendant.**

Civ. A. No. 88–0365.

United States District Court,
District of Columbia.

Sept. 15, 1989.

Robert N. Levin, Hudock & Levin, Gary S. Marx, Washington, D.C., for plaintiff.

A. Neal Barkus, Hunton & Williams, Washington, D.C., for defendant.

## OPINION AND ORDERS

REVERCOMB, District Judge.

The plaintiff, Guy A. Green, alleges that the defendant, his former employer, discriminated against him on account of his race in violation of Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000e–2), 42 U.S.C. § 1981, and D.C.Code Ann. § 1–2512, and that the defendant constructively discharged the plaintiff. Trial was held on May 15–19, 1989. The jury considered the § 1981 claim, the D.C.Code claim, and the constructive discharge claim; the Court considered the Title VII claim. The jury returned a unanimous verdict finding no liability for each claim it considered. The plaintiff then filed a motion for a mistrial and the defendant filed a motion to dismiss the § 1981 claim. In this Opinion, the Court denies the post-trial motions. In the Findings of Fact and Conclusions of Law, the Court finds no liability on the Title VII claim.

## I. FINDINGS OF FACT

### A. *Guy Green's Employment*

The defendant, Kinney Shoe Corporation, operates "Foot Locker" stores, which sell shoes and other items to the public. Foot Locker specializes in selling athletic shoes.

Mr. Green, who is black, was hired by the defendant's Foot Locker division in 1983 in the Washington, D.C., area. He entered Foot Locker's management training program soon thereafter and had no complaints about the treatment of him by his superiors. He worked at a number of stores in the Washington area and completed his training in early 1985. He was promoted to "manager-in-waiting" in February 1985.

Mr. Green was assigned to manage the Foot Locker outlet store in Fort Worth, Texas, on November 5, 1985. The outlet sold primarily to black and Hispanic customers. He managed the outlet until June, 1987.

Managing an outlet differs from managing a regular Foot Locker store in a number of respects. Outlets do not specialize in selling the "hottest" athletic shoe. The manager of an outlet has a more difficult job than the manager of a regular store in that he must persuade consumers to purchase less popular shoes. On the other hand, the employees of an outlet generally have less interaction with customers than employees at a regular store. Accordingly, there are aspects of selling to customers at regular stores that one does not necessarily learn working at an outlet.

By all accounts, the Fort Worth outlet was very successful under Mr. Green's management. The store made more than $781,000 in sales during Mr. Green's first year as manager—a figure nearly twice the amount that Foot Locker had predicted. Mr. Green received praise from his supervisors.

In January 1987, Mr. Green informed his District Manager, Donald Singleton, that because he and his family wanted to return to the Washington area, he would resign from Foot Locker. Mr. Singleton asked Mr. Green to stay on as manager of the Fort Worth outlet for six months, in order to allow Foot Locker time to find a suitable replacement. In return, Mr. Singleton told Mr. Green that Foot Locker would pay for his move back to Washington and would ensure a Foot Locker job for him in the Washington area. Mr. Green agreed.

Despite Mr. Green's testimony, the court does not believe that Mr. Singleton promised Mr. Green that he would be given the first management position that became available in the Washington area. Such decisions were made by Larry Bresnick, Foot Locker's Washington District Manager.

During the first half of 1987, a few management positions became available in the Washington area. The Court concludes that the failure of Mr. Bresnick to assign Mr. Green to any of these openings was because Mr. Green was still working in Texas, and thus was unavailable. In addition, Mr. Bresnick also wanted Mr. Green, who had not worked in a regular store since 1985, to be given some training in the current state of the athletic shoe market. The Court concludes that Mr. Bresnick's failure to assign Mr. Green to any of the openings was not racially motivated.

In July 1987, Mr. Green moved to the Washington area and was assigned to be a manager-in-waiting at the Foot Locker in Forestville, Maryland. The Forestville store sells primarily to black customers, as do many stores in the Washington area.

Very soon after his return to Washington, Mr. Green went out on disability leave from work because of an injury not related to work. Mr. Green informed Mr. Bresnick that he was uncertain when he would be able to return to work—it was a "week to week" thing. Mr. Green returned to work on August 11, 1987.

While Mr. Green was on disability leave, there was a vacancy for the manager spot of the store in Ballston Commons in Arlington, Virginia, just outside Washington. The Ballston Commons store had a low volume of sales. Mr. Bresnick on August 17, 1989 appointed someone other than Mr. Green to manage the Ballston Commons store.

The Court concludes that Mr. Bresnick's decision not to appoint Mr. Green manager of the Ballston Commons store was not racially motivated. Although Mr. Bresnick knew that Mr. Green arrived back in Washington from a successful tenure at the outlet in Texas and wanted a management position, Mr. Bresnick had misgivings about placing Mr. Green in the management position at Ballston Commons. First, Mr. Green had no experience working in a "regular" Foot Locker since 1985 and thus probably was unfamiliar with the current trends and demands for athletic shoes in the rapidly changing and cutthroat regular store market. See Rudolph, "Foot's Paradise," Time, August 28, 1989, at 54–55 (citing the need to keep up with the rapidly changing market in athletic shoes). Mr. Bresnick wanted Mr. Green to learn about the current trends in the market, through his work at the Forestville store, before being promoted to manager. Second, although Mr. Bresnick knew that Mr. Green

had done a good job in Texas, Mr. Bresnick had never seen Mr. Green work, and had not had a chance to evaluate his performance as a manager in a crowded regular store.

Soon after returning to work from his medical absence, Mr. Green's work performance at Forestville deteriorated rapidly. Mr. Green showed up for work late or left early a number of times. On October 16, 1987, Mr. Green was presented with a written warning after he failed to open the store on time. The warning stated that it was the second time in two weeks that Mr. Green had been more than two hours late to work. In another instance, Mr. Green was reprimanded by his supervisor for taking six hours off for lunch.

Mr. Green also was involved with conflicts with fellow Foot Locker employees. Once, he disciplined a part-time worker by picking him up and pinning the employee's back to the wall. Mr. Green testified that the action was done in good spirits; the fellow employee disagreed. In another instance, Mr. Green engaged in a shouting match with a co-worker in front of customers.

Mr. Green admits that his work deteriorated during this time, that he became moody, and that he started to drink heavily. Mr. Green attributed his poor performance to disillusionment about not being given a management position upon his return to Washington. An expert called by the plaintiff, Dr. Hamilton, testified that Mr. Green's feelings and behavior were consistent with a *perception* of being a victim of racial discrimination. In January 1988, Mr. Green began to see Dr. Manizade, a psychiatrist, who prescribed for him medicine to help relieve stress and to enable him to sleep.

Mr. Bresnick heard of Mr. Green's problems and saw the deficiencies in Mr. Green's work first hand when he visited the Forestville store. Mr. Bresnick told Mr. Green that his work would have to improve before he would assigned to manage a store in the Washington area.

In December 1987, Mr. Bresnick changed Mr. Green's pay from a salary to being on commission.

Mr. Green was passed over for the management positions that became open at five stores in late 1987 and early 1988. The five stores were: (1) Capitol Plaza in Maryland, which became available in November 1987; (2) Mazza Gallery in Washington, which opened in December 1987; (3) National Place in Washington, which opened in December 1987; (4) Prince Georges Plaza in Maryland, which had an opening in December 1987; and (5) Eastover, which opened for business in January 1988.

Mr. Bresnick decided not to promote Mr. Green to any of these openings because of Mr. Green's poor work performance and the lack of indications that his work was improving. In addition, Mr. Bresnick concluded that the sales volume at the store in Prince Georges Plaza was too large for Mr. Green, who had management experience only at an outlet, to handle.

Mr. Bresnick did not fail to promote Mr. Green to any of the openings because of racial considerations.

Mr. Green never heard Mr. Bresnick or any supervisors say anything to indicate that their decisions were racially motivated. No one testified that Mr. Bresnick said anything to indicate that his decisions were racially motivated.

Mr. Green became dissatisfied with Foot Locker in early 1988. He resigned from Foot Locker on March 9, 1988, in order to accept a job with a competitor, Athlete's Foot. The Court concludes that when he resigned, Mr. Green was not working under intolerable conditions or in an atmosphere of racial hostility. His income when he resigned from Foot Locker was approximately $32,000 a year.

Mr. Green's work performance at Athlete's Foot was plagued by similar problems to those he showed while working for Foot Locker. He was given poor evaluations at Athlete's Foot by two black supervisors. He was fired on April 14, 1988, by a black supervisor.

From April 14, 1988, through October 22, 1988, Mr. Green was unemployed. On October 23, 1988, he began working at Howard University in Washington. His starting salary was $15,000 a year; on April 6, 1989, his salary was raised to $18,000 a year.

## B. Statistical Evidence

Much of the plaintiff's case involved statistical evidence concerning the racial makeup of the Foot Locker work force. The statistical evidence showed that there were few blacks in high management positions at Foot Locker.

Management at Foot Locker was divided up through 48 District Managers, of whom 47 were white. In the District of Columbia District, there were 18 stores. There were two black store managers in the Washington area, both in predominantly black areas. None of the four stores within the District of Columbia boundaries had a black manager.

Foot Locker made decisions whether to promote an employee to manager based on primarily subjective criteria. Foot Locker hired managers from among current Foot Locker employees.

There was no "affirmative action" program to increase the number of blacks who manage stores at Foot Locker.

Foot Locker generally categorized each regular store as either an "ethnic" or a "non-ethnic" market store. This distinction was created, according to Foot Locker, after the determination that customers in stores with a high percentage of "ethnic"— e.g., black, Hispanic—patrons prefer a different mix and offering of shoes than those in stores with a low percentage of ethnic patrons.

Of the 675 non-ethnic stores in the country, 13 (or 2 percent) had black managers. Of the 196 ethnic stores, 28 (or 14 percent) had black managers. The two black managers of stores in the Washington area managed two of the area's 11 ethnic stores. The relationship between whether a store is "ethnic" and whether it had a black manager was statistically significant, according to the testimony of the plaintiff's expert, Dr.

Goldsamt. He testified that there was a chance of six in 1,000,000 that Foot Locker's distribution of black managers primarily in ethnic stores resulted from chance alone. The expert concluded that blacks were two times as likely to be assigned to ethnic stores and non-blacks were four times as likely to be assigned to non-ethnic stores.

## II. CONCLUSIONS OF LAW

### A. Collateral Estoppel

■ The United States Court of Appeals for the District of Columbia Circuit has stated that, as a general rule, "when a case contains claims triable to a jury and claims triable to the court that involve common issues of fact, the jury's resolution of those issues governs the entire case." *Bouchet v. National Urban League, Inc.*, 730 F.2d 799, 803 (D.C.Cir.1984). The elements of proof in a Title VII racial discrimination case are virtually identical to those in a claim under 42 U.S.C. § 1981. *Roebuck v. Drexel University*, 852 F.2d 715, 738 (3rd Cir.1988). Most federal courts of appeals have ruled specifically that a jury's factual conclusions on a § 1981 claim is binding on the judge's factual decisions on the Title VII claim. *See, e.g., Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954–55 (2d Cir.1988). The Court of Appeals for the District of Columbia Circuit has not specifically ruled as such, but considering *Bouchet*, the Court finds no reason to believe that the rule in racial discrimination cases should be any different in this circuit from the general rule stated in *Bouchet.*

In the instant case, the jury concluded unanimously that the defendant Kinney Shoe did not discriminate on the basis of race against the plaintiff Guy Green, either under § 1981 or under the D.C. Human Rights Act. In addition, the jury found unanimously that Kinney did not constructively discharge Mr. Green. Because the Court is bound by the factual determinations of the jury, *see Bouchet*, 730 F.2d at 801, the Court also concludes that the defendant did not discriminate against the plaintiff and did not constructively dis-

charge him. Even if the jury's factual conclusions were not binding on the Court, the Court still would conclude that Kinney Shoe did not discriminate against or constructively discharge Mr. Green.

### B. The Disparate Treatment Claim

Under the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff may establish a *prima facie* case of discrimination in being considered for a promotion by showing (1) that he is a member of a racial minority group; (2) that he met the qualifications for the job; (3) that he was rejected; and (4) that someone else was promoted to the position. *Id.* at 802, 93 S.Ct. at 1824. A plaintiff may also establish a *prima facie* case through statistical evidence that there was a statistically significant deficiency in the representation of blacks in the employer's work force. *Davis v. Califano*, 613 F.2d 957, 962–64 (D.C.Cir.1979). Once a *prima facie* case has been established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the failure to promote the plaintiff. If this is shown, the burden shifts back to the plaintiff to try to prove that the proferred nondiscriminatory reason is actually a pretext for discrimination.

■ The plaintiff succeeded in making out a *prima facie* case for a number of the management positions for which he claims he was discriminated against on account of his race. He established that he is a minority, that he successfully completed Foot Locker's management training program, that he successfully managed an outlet store, and that there were no other specific qualifications for a management position. In addition, the plaintiff established through statistical evidence that there were very few black Foot Locker managers and that most of the black managers worked at "ethnic" stores. Mr. Green did not, however, present any evidence that any of the defendant's decisionmakers made any overt expressions of using racial considerations in their decisionmaking, either to Mr. Green or to anyone else.

■ The Court also concludes that the defendant articulated legitimate, nondiscriminatory reasons for not placing the plaintiff in each of the management positions that came available in the Washington area between the time that Mr. Green expressed dissatisfaction with his job in Texas and Mr. Green's resignation from Foot Locker.

With regard to the positions that became available before Mr. Green moved to the Washington area in June 1987, the Court believes that the articulated reason for not hiring Mr. Green—the arrangement to have Mr. Green stay in Texas until June 1987—was a valid, nondiscriminatory, and nonpretextual reason for not hiring Mr. Green.

With regard to the position at Ballston Commons, which became open while Mr. Green was on medical leave and was filled less than a week after Mr. Green returned, the Court concludes that the defendant presented legitimate, nondiscriminatory reasons for not hiring Mr. Green. In addition, the Court concludes that these reasons were not pretextual. Although Mr. Bresnick knew of Mr. Green's fine record in Texas, Mr. Bresnick was reluctant to place Mr. Green in charge of a new store so soon after Mr. Green left his position managing the outlet store in Texas. Because the merchandise and selling technique are significantly different in an outlet from those in a regular store, Mr. Bresnick wanted Mr. Green, who had not worked in a regular store since 1985, to have a reorientation period to the current state of the market at regular stores. Mr. Bresnick also wanted a chance to evaluate Mr. Green's performance in a regular store, which requires employees to engage in a considerable amount of one-on-one salesmanship.

With regard to the positions that became open after August 17, 1989, the Court also concludes that the defendant articulated legitimate, nondiscriminatory reasons for not hiring Mr. Green, and that the plaintiff failed to prove that these reasons were pretextual. When Mr. Bresnick had a chance to evaluate Mr. Green, he found his

performance unsatisfactory. Mr. Green had significant problems with his attendance and had a number of run-ins with fellow workers. The plaintiff admits that his attitude began to slip and that he began to drink heavily.

Through statistical evidence, Mr. Green established that there were very few black managers of Foot Locker stores across the nation and not many in the Washington area, which has a large black population. The plaintiff also presented expert testimony that there was very little chance that the fact that most black managers worked at "ethnic" stores was the result of chance.

There are, however, factors other than racially conscious decisionmaking that could account for the fact that most black managers worked in ethnic stores. For example, if it were true that a higher percentage of blacks applied for manager positions in ethnic markets than in non-ethnic markets, this could account for some or all of the result that most black managers worked in ethnic market stores. Because by definition a typical "ethnic" market included a higher proportion of minorities than a "nonethnic" market, it is reasonable to assume that the work force at a store would resemble the customer population in racial makeup, even in the absence of any racially discriminatory hiring practices. *See Teamsters v. United States*, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977) (absent discrimination, an employer's work force should be expected to resemble the racial makeup of the community).

■ While admitting into evidence a number of statistics and expert analysis, the Court did not permit the plaintiff to admit into evidence a statistical comparison of the proportion of blacks serving as Foot Locker managers in the Washington area to the proportion of blacks in the Washington labor market area as a whole. *See Green v. Kinney Shoe Corporation*, 711 F.Supp. 34 (D.D.C.1989) (pre-trial ruling).

The proper test would have been to compare the proportion of blacks hired to be Foot Locker managers in the Washington area to the proportion of blacks minimally qualified for the position—in this case, those who had successfully completed the management training program. *See Palmer v. Shultz*, 815 F.2d 84, 91 n. 6 (D.C.Cir. 1987). The rationale for this tighter comparison is that there may be a different proportion of blacks who are qualified for a particular position than the proportion of blacks in the general labor market, for reasons completely unrelated to the decisions of the defendant.

Of course, the preferred comparison—the proportion of blacks hired to the proportion of blacks qualified—may not be perfect in a case in which the plaintiff claims that the defendant has discriminated against blacks in determining who is in the pool of qualified applicants.[1] The possible inaccuracy of such a comparison does not mean, however, that the Court should then admit evidence of *another* inappropriate comparison—the proportion of blacks hired to the proportion of blacks in the labor market as a whole. In any event, in the instant case it was obvious to both the jury and the Court, looking at the raw numbers, that Foot Locker had very few blacks who were managers both in the Washington area and across the nation, even without a expert statistical comparison. Both the jury and the Court have concluded that, despite this fact, the defendant did not discriminate against Mr. Green.

## C. The Disparate Impact and Constructive Discharge Claims

■ The Court also concludes that the plaintiff failed to prove a case of discrimination through the doctrine of "disparate impact," by which the plaintiff identifies a particular hiring practice that statistically discriminates against blacks. It was agreed that Foot Locker's promotion decisions for manager were made primarily through the use of subjective criteria.

---

**1.** In this case, the plaintiff argued in papers that the defendant may have discriminated against blacks seeking to complete successfully the management training program, although there was little mention of this allegation at trial. Indeed, Mr. Green himself successfully completed the management training program without any complaints of restraints because of his race.

While use of subjective criteria can of course hide racially discriminatory motives, the fact that an employer does not attempt to use objective criteria does not mean that it discriminates. In *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), the Supreme Court stated that, to establish a case of disparate impact in a subjective promotion situation, a plaintiff "must begin by identifying the specific employment practice" with an adverse statistical impact on blacks. *Id.* at 2788. The plaintiff in the instant case failed to identify any such specific employment practice; indeed, the plaintiff hardly mentioned the disparate impact argument in his papers supporting the Title VII claim.

The Court also concludes that Mr. Green was not constructively discharged from Foot Locker. To succeed on this claim, a plaintiff must show that the defendant deliberately made working conditions so intolerable that a reasonable person in the position would be forced to resign. *E.g., Lake v. Baker*, 662 F.Supp. 392, 404 (D.D.C. 1987). The work situation must be viewed from an objective viewpoint. *Id.*

■ Although Mr. Green maintained that he was distraught over his failure to get a management job, the Court concludes that the defendant had not discriminated against Mr. Green, nor has it been shown that the defendant did anything else in violation of law with respect to Mr. Green. The defendant did not make his workplace intolerable—the only significant grievance Mr. Green had with Foot Locker concerned his failure to get a management position, hardly the sort of activity that may result in a constructive discharge.

*D. Motion for a Mistrial or Judgment Notwithstanding the Verdict*

■ The plaintiff also has moved for a mistrial or a judgment notwithstanding the verdict based on the decision of the Court not to give to the jury one of the plaintiff's proposed instructions. The plaintiff wanted the Court to tell the jury that

The Defendant contends that Mr. Green was not assigned to manage certain of the stores because of performance problems. If you find that Mr. Green had performance problems but that these problems were a direct result of Defendant's discriminatory behavior, Defendant may not use such performance as a legitimate basis for refusing to assign him to a store.

Plaintiff's Post–Trial Memo. at 12. The Court denies the motion.

First, the Court notes that when a judge declines to give a particular proposed instruction to the jury, it does not necessarily mean that the Court disagrees with the principle of law supposedly stated in the instruction or that it seeks to instruct the jury contrary to the instruction. Courts often choose not to give a proposed instruction because the instruction is written tendentiously, because it may be confusing to the jury, or because it is redundant to other instructions. The Court in the instant case declined to give the instruction because other instructions made clear to the jury that if they were to find for the plaintiff if they found *any* racial discrimination by the defendant against Mr. Green.

The plaintiff maintains that the proposed instruction followed the holding in *Broderick v. Ruder*, 685 F.Supp. 1269, 1280 (D.D.C.1988). The Court notes, however, that the questions for the jury in the instant case were significantly different from the question answered by the court at the end of the opinion in *Broderick*. In *Broderick*, a Title VII case, the court first noted that the plaintiff clearly and undeniably was the victim of sexual harassment and worked in a hostile atmosphere because of this harassment. *Id.* at 1278–80. After suffering this harassment, the plaintiff's work performance diminished; she was reprimanded and told that she might be fired. *Id.* at 1280. The remaining question for the court was whether her poor work performance justified under Title VII the reprimands and the threats that she might be fired. The court concluded that because the plaintiff's "mental condition was caused by and exacerbated by the hostile atmosphere in which she worked," the defendant could not use the poor work per-

formance to rebut the *prima facie* case of discrimination and justify the adverse action taken against the plaintiff. *Id.*[2]

The parallels between *Broderick* and the instant case are obvious: in each case the plaintiff alleged that he or she was discriminated against, that his or her work performance suffered as a consequence, and that the employer subsequently took adverse action against the plaintiff—reprimands in *Broderick*, failure to promote in the instant case. This is where the parallel ends, however. In *Broderick*, the question for the court was whether the employer could shield itself from liability by citing the plaintiff's poor performance, once the Court had *already* concluded that the plaintiff was the victim of harassment and that her work performance was a *result* of the harassment. Naturally, the court concluded that the defendant could not shield itself by raising the poor work performance under these circumstances. Unlike in *Broderick*, however, the jury in the instant case was still faced with the threshold question whether the defendant had taken any discriminatory action against Mr. Green at all. The jury was told that if they found by that the plaintiff's race was a motivating factor in the defendant's decision not to promote him for any of the management openings, then the defendant was liable for racial discrimination. In addition, the Court told the jury that the defendant would be liable if the plaintiff's race was *a* reason for the decision, even if there were other reasons.[3]

The question for the jury, therefore, was straightforward: Did the defendant take the plaintiff's race into account in any of the decisions not to promote him to manager? If the answer was "yes," the jury should have found the defendant liable, regardless of the cause of the plaintiff's poor work performance starting in September. In this case, an instruction regarding causation of the poor work performance would have been unnecessary. If the answer was "no," then the jury should have found the defendant not liable. If the jury found that there was no discrimination, then the plaintiff's poor work performance could not, of course, have been the result of actual discrimination. Again, an instruction regarding the causation for the poor work performance would have been unnecessary. Put another way, the jury was presented with a choice between two versions of the facts: the plaintiff argued that he was discriminated against on account of race, and that his poor performance starting in September was the result of this discrimination; the defendant argued that it never discriminated against the plaintiff on account of race, and thus the poor work performance could not have been attributed to racial discrimination. The jury believed the defendant's version and found unanimously that the defendant never discriminated against the plaintiff. The Court agrees with the finding that the defendant never discriminated against Mr. Green on account of race.

Because the Court concludes that the proposed instruction was not necessary, the Court DENIES the plaintiff's motion for a mistrial or a judgment notwithstanding the verdict.

### E. Defendant's Motion to Dismiss the § 1981 Claim

■ After the jury verdict was delivered, the defendant moved to dismiss the plaintiff's § 1981 claim. The motion was based

---

**2.** In opposing the plaintiff's motion, the defendant argued that the Court should reject the holding in *Broderick* because it would permit a employee to be shielded from adverse employment action if the employee shows that he or she *subjectively* felt that he or she was the victim of discrimination or harassment, which in turn led to the diminished work performance, whether or not the employee *actually* was the subject of discrimination or harassment. This is an incorrect reading of *Broderick*. It is true that the *Broderick* court did not and did not need to address the subtle distinctions between actual, objective harassment and perceived, subjective feelings of harassment. It is clear to the Court in the instant case, however, that the opinion did not—and should not be read to—permit an employee to be shielded from adverse action through an inaccurate subjective feeling of discrimination or harassment.

**3.** The § 1981 instructions followed E. DeVitt, C. Blackmar and M. Wolff, *Federal Jury Practice and Instructions* ch. 104 (1987).

on the holdings in *Patterson v. McLean Federal Credit Union*, — U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), a Supreme Court opinion handed down after the verdict in the instant case. *Patterson* restricted § 1981 claims to cases involving allegations of racial discrimination in the making or enforcing of contracts. *Id.* at 2372–73. When a plaintiff alleges that he was discriminated against in the context of seeking a promotion, the *Patterson* court ruled that "the question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." *Id.* at 2377. Only when "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981." *Id.*

The Supreme Court left to the lower courts to determine what constitutes a "new and distinct relation." District courts have already begun interpreting *Patterson;* this Court has held that a promotion that essentially involved only a raise in pay would not amount to a "new and distinct relation." *Williams v. National Railroad Passenger Corporation*, 716 F.Supp. 49 (D.D.C.1989). In the instant case, however, the Court concludes that promotion to "manager" would have involved a new and distinct relation between Mr. Green and his employer. In his position as a manager-in-waiting, Mr. Green essentially acted a shoe salesman, working for a manager. As manager, Mr. Green would have had significantly different responsibilities—including supervision and management. His salary also would have calculated in a different manner. Even more significantly, Mr. Green would have been evaluated differently by his employer—he would have been judged by the total sales of the store, the cleanliness and safety of the store, and how his salesmen were treated. This different method of evaluation, combined with the opportunity to be considered for higher managerial positions, satisfies the Court that the promotion that Mr. Green sought would have

involved a new and distinct relation with his employer. Accordingly, the Court DENIES the defendant's motion to dismiss the § 1981 claim.

### F. Title VII Order

Because the Court concludes, as did the jury, that the defendant did not discriminate against the plaintiff on account of race, the Court concludes that the defendant is not liable for a violation of Title VII.